## LEESE v. CLARK et al.

The Board of United States Land Commissioners, established by the Act of Congress entitled "An Act to Ascertain and Settle the Private Land Claims in the State of California," passed March 3d, 1851, had jurisdiction of a claim presented by the grantees for the confirmation of a Mexican grant, made in 1839, by Alvarado, then Governor, of lots within the limits of the pueblo of San Francisco ; and such claim was not required to be presented to the Board by the corporate authorities of the city.

The second provision of section fourteen of the act, requiring the claim to any city, or town, or village lot, where the city, town or village existed on the seventh of July, 1846, to be presented to the Board by the corporate authorities, does not extend to all lots situated *within the limits* of the city, town or village which thus existed, but only to lots belonging to or claimed by such city, town or village, thus authorizing, with other provisions of the section, the corporate authorities to present, under one general claim, the interest of the .city, town or village, and the separate interests of individuals under concessions from those authorities.

The confirmation of a claim, whether made to corporate authorities or to individuals, can only be for the benefit of the claimants or parties deriving title through them. It cannot inure to the benefit of parties holding adversely to the title confirmed, as there exists no privity of estate between them and the confirmee.

To a patent issued upon the confirmation of a grant from the Mexican Governor of lots within the limits of the pueblo, the same operation and effect should be accorded as to any other patent, regular upon its face, issued by the United States, upon the confirmation of a claim under a Mexican grant, pursuant to the Act of Congress of March 3d, 1851.

Leese *v.* Clark.

A patent is the last act of a series of proceedings taken for the recognition and confirmation of the claim of the patentees to the land it embraces, the first of which is the petition to the Board of Land Commissioners. With respect to such proceedings it takes effect by relation at the date of the first act. As the deed of the United States, it is to be regarded as if it had been executed at that time. It passes whatever interests the United States may then have possessed in the premises. It operates in consequence as an absolute bar to all claims under the United States, having their origin subsequent to the petition. A patent has a still further operation and effect. It is also a record of the Government, showing its action and judgment with respect to the title of the patentees at the date of the cession. By the treaty of Guadalupe Hidalgo, the United States stipulated for the protection of the rights of property of the inhabitants of the ceded territory. Independent of treaty stipulations, the inhabitants were entitled to such protection by the law of nations. The obligation thus devolved upon the Government, upon the acquisition of the country, was political in its character, and to be executed in such manner as it might judge expedient. To execute this obligation, required an inquiry into the nature and extent of the claims asserted to property at the date of the treaty. This inquiry involved an investigation into the genuineness of the title papers of the patentees, and an ascertainment of the quantity, location and boundary of the property claimed. The patent is the final act on the part of the Government, resulting from such inquiries; and as to all the matters of fact and law essential to authorize its issuance, it imports absolute verity. It can only be vacated and set aside by direct proceedings instituted by the Government, or by parties acting in the name and by the authority of the Government. Until thus vacated, it is conclusive, not only as between the patentees and the Government, but between parties claiming in privity with either by title subsequent.

The "third persons" within the meaning of the fifteenth section of the Act of Congress, who can controvert the location of a grant, upon which a patent has issued, are those whose title to the premises patented not only accrued before the duty of the Government, and its rights under the treaty attached, but whose title to such premises was at that date such as to enable them to resist successfully any subsequent action of the Government affecting it.

The political head of the Department of California possessed authority to grant lands within the pueblo of San Francisco, and in numerous instances exercised it; such authority was paramount, and its exercise could not be interfered with or defeated by any subsequent action of the pueblo or its officers.

Admitting the power of American Alcaldes to grant lands within the pueblo, it only extended to lands which had not been previously granted by the superior authorities of the department under the former Government. Nor does it matter in any respect whether the grant of those authorities passed a legal or an equitable title. The moment they assumed the control of the property and passed any interest in the same, all granting power of the subordinate officers of the pueblo, with respect to the property, ceased.

Where a grant was made by the Governor and received by the grantee, there still remained another proceeding to be taken for the investiture of a complete title. The proceeding was a judicial delivery of the possession. This pro-

Leese v. Clark.

ceeding was an essential ceremony when there was any uncertainty as to the precise bounds of the land granted, and involved a definite ascertainment of the land to be delivered, and for that purpose required a survey and measurement—in other words, a location of the land.

By the Act of March 3d, 1851, the new Government has designated the manner and conditions under which the right and power of location will be exercised, and declared the effect which shall be given to the proceedings had. Parties taking in subordination to the future action of the Government, old or new, in determining the limits of an elder grant, are in no position to question those proceedings.

As the Government acts in the location of a Mexican grant only through its appointed tribunals and officers, if it discover that imposition and fraud have been practised upon them, and have produced a result which otherwise would not have been obtained, it may itself institute proceedings to vacate the confirmation and patent, and annul or correct the location. But unless the Government interferes in the matter, junior grantees are remediless.

Persons holding Alcalde grants made in 1847, for lots within the pueblo of San Francisco, took their grants in subordination to the future action of the Government, old or new, in determining the limits of elder grants for lands within the pueblo, made by Mexican Governors, and are not "third persons" within the fifteenth section of the Act of Congress, who can question the action of the Government in locating such elder grants. Such persons cannot resist a patent for lands based upon confirmation of an elder grant.

The language of the Court in *Fremont* v. *United States*, (17 How. 558) to the effect that a subsequent grantee of a tract with specific boundaries, within the general exterior limits of the grant in that case, would have acquired a superior and better title than the original grantee, shown to have no application to this case, for the reason that there the grant was of a specific quantity of land lying within limits embracing a much larger quantity, and within which other grants might be made; while here the grant is of a tract of designated, though uncertain, boundaries; but embracing no surplus to be the subject of other grants.

APPEAL from the Fourth District.

This was an action of ejectment to recover the possession of two one hundred vara lots, situated within the city and county of San Francisco. The plaintiff based his claim to a recovery of the premises upon a grant made to himself and Salvador Vallejo on the twenty-first day of May, 1839, by Juan B. Alvarado, then Mexican Governor of the Department of California, and upon a patent of the United States issued to them on the third day of March, 1858, upon the confirmation of the grant, pursuant to the Act of Congress of March 3d, 1851, and the approved survey of the premises by the Surveyor General of California following such confirmation.

35

The following is a translation of the petition to the Governor, and of the grant made by him in compliance with it :

[Petition.]

To his Excellency the Governor of Upper California—JUAN B. ALVARADO :

The undersigned, Jacob P. Leese and Salvador Vallejo, respectfully represent to your Excellency that, [considering that] the diminished resources of the country will deprive your Excellency of the power of repaying the expenses which by your order we have incurred in lighters, transport of troops, mails, and other services even of a personal nature, which we have done in this place, in Santa Clara, San José, Sonoma, and San Rafael for the public tranquility, we have thought fit to make a contract with the Commander of Ross, Don Pedro Kostromitinoff, to erect some houses, store houses, and a wharf, for the purposes of his business at this place, and requiring two town lots for the said buildings, we petition your Excellency to grant us two lots of one hundred varas each at the point (or place) known as the landing place of Yerba Buena—these lots commencing from the same point (or place) of the landing place at the shore of the sea, [and running] to the little beach northerly, which is a frontage of two hundred varas, and in depth, in a westerly direction towards the hill, one hundred varas.* We also ask for twenty-five varas in the sea at the same point (or place) of the landing place for the construction of the wharf referred to.

For the reasons set forth, we pray that your Excellency will grant us the favor we ask ; for which we will be duly grateful ; requesting also that you will excuse our using common paper for our want of stamped.     (Signed.)          JACOB P. LEESE.
                                                      SALVADOR VALLEJO.
SAN FRANCISCO, May 12th, 1839.

[Grant.]
MONTEREY, 21st May, 1839.

[L. S.]        " There are granted to the parties interested, Don

---

*NOTE.—In the translation of the petition as given in 3 Cal. 20, the lots solicited are described as follows : " The said lots beginning at the point of the Desembarcadero, (and running) on the sea shore as far as the Playita, in a northerly course, making the front of two hundred varas, and in depth east and west one hundred varas towards the hill."

Leese v. Clark.

Jacob P. Leese and Don Salvador Vallejo, the two lots of one hundred varas each in the place and on the terms set forth by them, to make their warehouses, under the conditions which will be explained.*

The Commander of the presidio of Ross to have no right whatever in this concession—the land ceded being considered as property of Mexicans, which the interested parties are.

First. At no time nor for any reason whatever shall the Commander of Ross believe himself to be the owner of the warehouses, because all the buildings that may be erected should be regarded as property of Mexican citizens.

Second. This license does not destroy, nor has it any manner of effect contrary to the laws nor the decrees of the National Government respecting the traffic or privileges which the Russians may or may not enjoy in the future on their entry to the port of San Francisco with a view to trade, since (or seeing that) their particular contract does not confer any right or any kind of right, either on the individuals interested or on the traffic mentioned.

Third. The wharf which it is proposed to build cannot be exclusively for the benefit of private individuals, but it will be considered as property of the Government, for the use of commerce in general. The Government itself will impose the wharfage dues which may be thought fit.

Fourth. If the beneficiaries should contravene these stipulations they will forfeit their rights alike in the buildings and in the lots—they reverting to the Government for such uses as it may see fit.

I, Juan B. Alvarado, Governor of the Department of the Californias, order that this be delivered to the parties interested, that it may serve them as a title, note being taken in the corresponding book.

(Signed.)     Juan B. Alvarado.

Manuel Jimeno, *Secretary*.

Note has been taken in the Secretary's office, under my charge, in the proper book at page 7.     (Signed.)     Jimeno.

Monterey, 21st May, 1839.

The patent of the United States is in the usual form of patents

---

* Note.—In the translation of the grant as given in 3 Cal. 21, the language is somewhat different, and is as follows: "The two lots, of one hundred varas each, are granted to the petitioners, Don Jacob Leese and Don Salvador Vallejo, at the place and with the boundaries which they described."

issued upon the confirmation of Mexican grants.    It refers to the grant; its confirmation by the Land Commission; the appeal to the District Court of the United States, and the action of that Court upon the case; and sets forth the survey of the lots as made under the directions of the Surveyor General, and approved by him; and concludes with the usual granting clause on the part of the United States.

The following are the eighth, fourteenth and fifteenth sections of the Act of Congress of March 3d, 1851, entitled "An Act to Ascertain and Settle the Private Land Claims in the State of California," which are referred to in the opinion of the Court:

" Sec. 8.  *And be it further enacted*, That each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Government, shall present the same to the said Commissionors when sitting as a Board, together with such documentary evidence and testimony of witnesses as the said claimant relies upon in support of such claims; and it shall be the duty of the Commissioners, when the case is ready for hearing, to proceed promptly to examine the same upon such evidence, and upon the evidence produced in behalf of the United States, and to decide upon the validity of the said claim, and within thirty days after such decision is rendered, to certify the same, with the reasons on which it is founded, to the District Attorney of the United States in and for the district in which such decision shall be rendered.

" Sec. 14.  *And be it further enacted*, That the provisions of this act shall not extend to any town lot, farm lot or pasture lot held under a grant from any corporation or town to which lands may have been granted for the establishment of a town by the Spanish or Mexican Government, or the lawful authorities thereof, nor to any city, or town, or village lot, which city, town or village existed on the seventh day of July, 1846; but the claim for the same shall be presented by the corporate authorities of the said town, or where the land on which the said city, town or village was originally granted to an individual, the claim shall be presented by or in the name of such individual, and the fact of the existence of the said city, town or village on the said seventh of July, 1846, being duly

proved, shall be *prima facie* evidence of a grant to such corporation, or to the individual under whom the said lot holders claim ; and where any city, town or village shall be in existence at the time of passing this act, the claim for the land embraced within the limits of the same may be made by the corporate authority of the said city, town or village.

" Sec. 15. *And be it further enacted,* That the final decrees rendered by the said Commissioners, or by the District or Supreme Court of the United States, or any patent to be issued under this act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

The defendants produced and gave in evidence sundry grants of the same premises in lots of fifty varas each, issued to them or their grantors in 1847, by persons acting as alcaldes or chief magistrates of the pueblo of San Francisco, and also proved that the premises were within the limits of the pueblo. They contended on the trial, in substance, that as the lots covered by the grant to the plaintiff and Vallejo were within the limits of the pueblo, the Board of Land Commissioners had no jurisdiction under the fourteenth section of the Act of Nov. 3d, 1851, to pass upon the claim of the grantees ; and that the subsequent action of the United States District Court, and of the Surveyor General in making the survey, and of the authorities at Washington in issuing the patent, were without authority and void ; or if the Board had such jurisdiction, that the defendants claiming under the Alcalde grants were " third persons," within the meaning of the fifteenth section of that act, against whom the decree of confirmation and patent were not conclusive, and that they could in consequence question the location of the premises as given in the patent, as much so as if no proceedings had been taken before the Land Commission.

Evidence as to the starting point of the premises—the Desembarcadero or landing place of Yerba Buena—was admitted by the District Court, notwithstanding the patent, and was conflicting in its character. The Court charged the jury with reference to the patent as follows :

" A patent from the Government of the United States to Leese and Vallejo, and also a deed of conveyance from Vallejo to plaintiff, have been given in evidence.

" This patent is conclusive between the United States and Leese and Vallejo as to the land mentioned and described therein, and the deed from Vallejo to Leese is sufficient to convey the title of Vallejo to the land therein mentioned to Leese ; but it is declared by the Act of Congress referred to [the Act of March 3d, 1851] that the patent is conclusive between the United States and the claimants *only*, and does not affect the interests of third persons.

" Therefore, although so far as respects the Government of the United States, and all persons claiming under that Government, the plaintiff by virtue of the patent may be entitled to hold or recover the lands mentioned therein, it does not follow that he is entitled to recover in this action, although the lands mentioned in the complaint are the same as those described in the patent.

" The fourteenth section of the Act of Congress referred to, declares that the provisions of the act shall not extend ' to any city, town or village lot, which city, town or village existed on the seventh day of July, 1846, but the claim for the same shall be presented by the corporate authorities of the said town, or where the land on which the said city, town or village was originally granted to an individual, the claim shall be presented by or in the name of such individual ; and the fact of the existence of the said city, town or village on the said seventh of July, 1846, being duly proved, shall be *prima facie* evidence of a grant to such corporation or to the individual under whom the lot holders claim ; and where any city, town or village shall be in existence at the time of the passing this act, the claim for the land embraced within the limits of the same may be made by the corporate authority of the said city, town or village.'

" From this, it follows that if the lands described in the patent were city, town or village lots of a city, town or village which was in existence on the seventh of July, 1846, then neither the Board of Commissioners nor the District Court of the United States had any jurisdiction of the claim, and the patent issued for such claim is of no validity so far as it affects the interests of these defendants, unless it is land originally granted to Leese and Vallejo before the city, town or village existed, or for the purpose of a city, town or village ; it also follows from the provisions of the fourteenth

section, that if at and prior to the time of the alleged grant of Governor Alvarado to Leese and Vallejo a town existed at the place where the lands mentioned in the grant are located, and that they were then town lands, and it was a grant of town lots, then said Leese and Vallejo are not original grantees within the meaning of this act, and the patent cannot affect the interests of these defendants.

" The Supreme Court of this State has decided that during the year 1839, and from then until the military occupation of California by the army of the United States, San Francisco was a Mexican pueblo, and invested with title to lands within her boundaries. It follows, then, at the time, to wit: May 21st, 1839, when the grant from Alvarado was made, San Francisco was a Mexican pueblo, invested with title to lands; and if you should find that the lands mentioned in the grant were, at the time they were granted, within the pueblo limits, then they are town lots within the meaning of the Act of Congress, and in that case you must exclude from your consideration the patent from the United States, and cannot base your verdict upon the description of the land or anything contained in it so as to affect the interests of the defendants, if they have any in the same lands."

To this charge the plaintiff's counsel at the time excepted. The jury found for the defendants on the ground, as stated in their verdict, that they could not locate the grant as claimed by the plaintiff. A motion for a new trial, based, among other grounds, upon alleged error in the charge of the Court, was made, and overruled. From the order overruling the motion the appeal is taken. All other material facts are stated in the opinion of the Court.

*Volney E. Howard*, for Appellant.

The interest of Vallejo was regularly vested in Leese by competent conveyance. The defendants relied on American Alcalde grants issued in 1847.

1. We do not contest the existence of a pueblo in San Francisco in 1839.

2. But we maintain that a Spanish or Mexican Governor could grant in any portion of a pueblo in Spanish America, except in the

commons (ejidos) and municipal lands, (propios) streets, public squares, &c. That the fee to the balance always remained in the Government.

3. And, further, that the fee to the whole remained in the Government until the commons and municipal lands were duly measured by authority of the granting power, which never was done in San Francisco. That the Vallejo line is proved by Vallejo himself to have been only a jurisdictional line between the Mission and the Presidio. That until these reservations were segregated, a Governor could grant in any portion of a pueblo, except the streets, public squares, &c., as shown by the whole history of the subject, both under the Governments of Spain and Mexico.

4. That the decree of the Governor and Departmental Assembly in 1835, which gives authority to the local officers to grant town lots at Yerba Buena, expressly reserves from the action of the local officers the land within two hundred varas of the sea, as a part of the public domain, and therefore the authority to grant the *locus in quo* was exclusively in the Governor.

5. It is conceded that every pueblo in California had an equity to have assigned to it "competent" commons, and propios, in the language of the Spanish law. That what was competent in extent was a question within the discretion of the granting power. That the Government of the United States took all the ungranted lands within the pueblos of California, charged with this equity, under the treaty which the Congress of the United States executed, by creating the presumption of a grant under the Act of 1851, which was subsequently confirmed as a grant by the United States Land Commissioners, acting under the authority of the legislation of Congress.

Decrees of the Spanish Monarchs, as far back as 1523, are to be found in the laws of the Indias, authorizing the grant of commons and municipal lands to the towns in Spanish America. These laws are expressly recognized by the Colonization Law of 1824, and the Regulations of 1828, for the granting of land and the colonization of California. By the decrees of the Spanish Crown, as already stated, where a town was founded, four leagues were directed to be surveyed as the exterior limits. When the surface of the land

would admit of it, the survey was to commence from a public square, as a common center from which one league was to be measured to every point of the compass.   The same laws directed that a certain proportion of lots should be surveyed from the center and granted to private individuals; that another portion should be reserved for future grant by the Sovereign; that convenient streets, walks, public squares, &c., should also be laid out, and that the officers laying out the town should measure also " competent " commons, municipal lands, and certain reservations for other purposes.   It will be seen that the foundation of a town did not vest all lands within its limits in the pueblo.   Nothing was vested in the pueblo besides streets, public squares, commons, municipal lands, &c.   In order to the passing of title to the commons and municipal lands, and vesting it in the pueblo, it was necessary that a measurement or segregation should take place.   This measurement was often neglected, but the Governments of Spain and Mexico always recognized in the pueblos the validity of the claim to have these lands set apart to them by the proper officers.   (Liber 4, tit. 7, law 7 of the Recopilacion de las Indias; Law 14, same book and title; Law 6, of tit. 5, Liber 4; 2 White, 47, 46, Lib. 4, tit. 7, Law 11; Law 10, tit. 5, Liber 4, 2 White 45; also, Liber 4, tit. 7, Law 2, White 46.)

The special regulation for the colonization of California, approved by Royal Order in 1781, expressly recognizes the existing laws of the Indias, as to the extent of the pueblos; and provides that: " Conformable to the same, competent common lands (ejidos) shall be designated for the pueblo, and pasture grounds, with the sowing lands that may be necessary for municipal purposes (propios)."

Indeed, the whole theory of the settlement of the towns in Spanish America was, that after the assignment of sufficient commons and liberties, lots should be granted gratuitously, from time to time, to the settlers, and that the balance of the land inside the exterior limits should be reserved to the King for future grant.   The Governors, from time to time, continued to grant lands in the towns in Mexico down to the period of the Mexican Revolution.   Nothing was vested in the pueblo, except the streets, squares, etc., as the pueblo was laid out, and the ejidos, propios, dehesas, etc., being assigned by competent officers.   The lots were granted by the

authority of the King, and in his name. And after the assignments and grants above specified, the title to the remainder was expressly reserved to the King by a decree as early as 1823, contained in the laws of the Indias, which was never changed, but was in full force at the date of the Mexican Revolution in 1821. (8 Cal. 193 ; House Doc. 17, 31st Congress, 1st Session, 134.) The Colonization Law of 1824 recognizes the pueblos as they stood. The Regulations of 1828 expressly adopt the existing law. (10 Cal. 636.)

There are very few Mexican regulations on the subject. Owing to the fact that the Spanish law was continued in force, except in a few States and Departments, such as Texas and some others, where the grants were made by Commissioners, town lots continued to be granted by the Governors, and by other officers in the name of the Mexican Nation. It was owing to the fact that the Spanish law fixed no special amount for the common and municipal lands, (ejidos and propios) but declared that they must be " competent," that the authorities were constantly urged to assign them. This was the foundation of the recommendation of Governor Alvarado in 1840, although he had moved in the Assembly the Castro order of 1835. The mere running the exterior lines, like the act of Vallejo, was not intended, and did not operate the assignment of the liberties of the town. It required a special designation of each tract for pasture and municipal lands. ( *Welch* v. *Sullivan*, 8 Cal. ; *Hart* v. *Burnett*, 15 Id. ; Green's Case, 2 Wheat.)

Again, for other reasons we maintain that a Mexican Governor had power to grant a lot within a town.

The Regulations of 1828 for the colonization of California, made in pursuance of the Colonization Law of 1824 for the colonization of territory, declare that " the land given for a house lot shall be one hundred varas." The Regulations of 1828 refer exclusively to grants by the Governor approved by the Assembly. Sections ten and thirteen refer exclusively to the settlement and colonization of towns, or pueblos, and the grants for that purpose by the Governor.

As a matter of fact, usage and custom, the Governors granted lots of different sizes in all the towns and pueblos of California. According to the cases of *Hart* v. *Burnett* and *Payne & Dewey* v.

*Treadwell*, these grants are *prima facie* regular and valid, and there is no proof in the record to contradict the presumption.    As said by the Court in the case of *Hart* v. *Burnett*, the title might be in the pueblo, and the law confer upon the Governor the right to grant the land.    It was competent for the President or the Governor and Assembly to regulate in what manner the lands of a municipal corporation should be administered and granted.    (*Hart* v. *Burnett;* Angell on Corporations.)

The instructions of the Judge in relation to the patent were erroneous.    He admitted it in evidence as good between the United States and plaintiff, but told the jury they could not consider it for any purpose, not even that of location, so far as the defendants were concerned, if they found the patent was for a village lot, or within the limits of a pueblo, on the ground that the United States Land Commission had no jurisdiction of such a case.    It is difficult to understand how a patent whose validity depends upon a question of jurisdiction can be in part valid and in part void.

This was not a town lot held under grant from any town, within the meaning of the first clause of section fourteen, Act of Congress, 1851.    It was held under a Governor's grant.    Neither was was it a " city, or town, or village lot," within the meaning of the act.    The act refers to a town lot derived by grant from the town authorities, or from an individual who had so founded a town that the title of many persons would have a common origin.    The fact that a lot is within the limits of a town does not bring it within the act.    There would be no privity of estate.    It was not the intention of the Act of Congress to require the city to present the claim of John Jones, merely because within the city limits, when his title was altogether foreign to that of the city.    In such a case the city would have no means of establishing his title, and if it had, it never could have been in the contemplation of Congress to subject the city to the expense of proving up the title of third parties with which its own had no connection.

In point of fact, the city, instead of presenting this claim for confirmation, prayed that the grant to Leese and Vallejo, and other Governor's grants within the city, might be annulled.    Their prayer was expressly denied by the Commission.    See the opinion of the Commission in this case as to the law.

The Board took jurisdiction of the case of Leese and Vallejo, and confirmed the claim ; the appeal was dismissed, and a patent has issued.    This decision is as conclusive and as much *res judicata* as though it were the judgment of the Supreme Court of the United States on appeal.    The Commission had jurisdiction of the subject matter of land claims, and their judgments are binding until regularly reversed, not only on the United States, but on every party claiming title through the action of the United States Government. (*Brown* v. *Jackson*, 7 Wheat. 218 ; *Wilcox* v. *Jackson*, 13 Pet. 516 ; Opinion of the Commissioners in Leese and Vallejo.)

This question of jurisdiction was made before the Commission, and overruled.    Suppose the case had gone to the Supreme Court of the United States, and the question had been ruled the same way, would there be any pretense of a power to review it, and least of all to set it aside by a collateral proceeding ?    The decision of the Commission until reversed is equally binding under the Act of Congress.    (1 Brod. & Bing. 432 ; 5 Eng. C. L. Rep. 137 ; *Brittain* v. *Kinnard*.)   ·

*H. P. Irving*, also for Appellant.   .

I.    In this case the counsel for the defendants make the point that the patent is void as a patent, because the Land Commission had no jurisdiction of the case.    This position is taken upon a construction of the fourteenth section of the Act of Congress of 1851.

It is admitted that the act is awkwardly drawn.    But a fair construction of the language of the fourteenth section itself, gave the Land Commission jurisdiction of the case.    The respondents base their argument upon a single portion of the section, without taking into view the remainder thereof, or at all regarding the objects of establishing a Land Commission.    These objects were, to ascertain what grants had been made by the Mexican Government that bound the United States, and to give a patent from the Government for the grants made by the Mexican Government.    What was the object of limiting the right of presenting claims under section fourteen ?    It was to prevent a multiplicity of cases being presented to the Land Commission, where the Government or its agents were not the grantors, but where the holders were

subgrantees from the grantors of the Government. In other words, the object of the statute was to cause claims to be presented by the corporation or individual to whom the title first passed from the Mexican Government.

The latter clause of the section fully sustains the position we have stated above, that the Statute of 1851 " was to cause claims to be presented by the corporation or individual to whom the title first passed from the Mexican Government.",

It is true that the grant to Leese and Vallejo does not cover the whole of the town of San Francisco, then ·Yerba Buena; but it will hardly be contended that, for that reason, it should not be presented in the name of the original grantees.

We do not understand it to be necessary that the whole site of a town should be granted to one individual, in order to give the Land Commission jurisdiction.

There is another clause of this section, which provides that " where any city, town or village shall be in existence at the time of passing this act, the claim for the land embraced within the limits of the same may be made by the corporate authorities of the said city, town or village."

This was to provide for the case where the land was originally granted to an individual, which individual had ceased to have any interest in the land, and where a city or town had grown up upon the land. In such case, instead of presenting the title by the original grantee, the claim for the same " may be made by the corporate authorities of said city, town or village."

This general clause provides for a class of cases that had not been provided for by the previous parts of this section; and it was necessary, in order to secure the land to the persons owning the same, and, at the same time, prevent presenting a multitude of cases for small lots to the Land Commission.

In this case, the Court will observe that no actual grant to the city is proved. It is only attempted to prove the existence of a city or town on the seventh of July, 1846. Now, if a city or town did then exist, it was, before the Land Commission, only *prima facie* evidence of a grant. If so, it stood precisely as if a grant had been made, unless such *prima facie* case was rebutted. But when

would the Land Commission presume the grant was made? Certainly no time is fixed. And it can only be presumed to have been made on the seventh of July, 1846. This was long subsequent to the grant, in 1839, to Leese and Vallejo. This grant was made to Leese and Vallejo originally, and Leese presented the claim to the Land Commission. The act says it must be presented by him, or in his name. The act has been literally complied with.

II. Having shown that the plaintiff exhibited on the trial a patent, we now proceed to inquire into its nature and effect, as an instrument of evidence. The law under which this patent was acquired prescribed the mode by which it should be obtained, and the tribunal before which the proceedings should take place. Those proceedings were in the nature of proceedings *in rem* and not *in personam*. The Board obtained jurisdiction of the subject matter of the grant by the filing of the petition. In their very nature they were conclusive and binding upon the whole world. They were legal adjudications upon the subject matters involved in the petition. The law itself prescribed the result of these petitions as a patent. Now what is the general nature of a patent? What is its legal effect? What does it prove? What does it permit to be contested? We answer that it proves every fact which it was necessary to establish in order to obtain the patent. The patent in this case recites the grant to Leese and Vallejo as having been made by the Mexican Government on the twenty-first of May, 1839. The patent relates back to the grant and is founded on the grant; the proceedings, therefore, which resulted in a patent, establish the fact that the Mexican Government on the twenty-first of May, 1839, executed the grant to Leese and Vallejo. This was a fact necessary to be established in order to obtain the confirmation which resulted in the issuance of the patent. This fact, then, thus judicially established, cannot be contested. Nothing, therefore, inconsistent with this legal adjudication can be admitted.

Nor can the survey made by the appropriate department of the Government be contested or attacked collaterally. (*Moore* v. *Wilkinson*, 13 Cal.)

The question presented is, whether a party claiming by a subsequent grant to the one on which the patent is issued is one of the

third parties protected from the effect of a patent by the fifteenth section of the Act of March, 1851. We say that those parties whose interests are protected are parties holding prior and paramount claims to the land. Or in the language of the decision in *Moore* v. *Wilkinson*, "individuals can only resist the conclusiveness of the patent by showing that it conflicts with prior rights vested in them."

The defendants in this case attempted to resist the conclusiveness of the patent issued upon the grant of 1839, by showing an Alcalde grant issued in the year 1847. It is contended that this construction of the fifteenth section would not only be against the express words of the act, but would operate unjustly, because it would conclude a party who was not heard before the Land Commission, and who had no means in that proceeding of contesting the plaintiff's claim. But what injustice is there in the construction for which we contend? We contend that our construction gives ample scope for the operation of that provision. Thus the defendant might prove that the land embraced in our grant had been conveyed to him by a grant of a previous date to the one under which we claimed. He might have shown that it was conveyed to a third party, and that it was still vested in that third party, and thus established an outstanding title. He might have filed his bill in the name of the Government to set aside the patent for fraud. What we maintain is, that the patent is an instrument of evidence proving certain conclusions of law and fact. That it is a record importing absolute verity, and that these conclusions cannot be contested except to the extent before explained. In other words, we admit that the defendant might have proved that no title passed by the concession, but he cannot deny the fact of a concession having been made by the Mexican Government to Leese and Vallejo of the land ascertained by the survey.

The view we have taken to show that a subsequent grantee has no right to contest the conclusiveness of a patent is, we think, sustained by the Court, not only in the case of *Moore* v. *Wilkinson*, quoted above, but in the subsequent cases of *Mott* v. *Smith* (16 Cal. 533) and *Doll* v. *Meador* (Id. 295).

III.   Defendants claim to have acquired a perfect title by virtue

of his Alcalde grants.  We might well ask upon what authority these American Alcaldes pretended to grant lots under any circumstances?  But we waive that question; but we ask by what authority the American Alcaldes claim the right to grant lands that had been already ceded by the Mexican Government?  If the grant to Leese and Vallejo was admitted to be a mere inceptive title, it cannot be denied that the claim was one that the grantee had a right to have perfected by the Mexican Government.  Neither can it be denied that the right as well as the duty of the Mexican Government was transferred to the United States; that the Government of the United States became charged with that duty, and clothed with that power, by virtue of the treaty.  The Act of 1851 was but a mode prescribed by the United States for the exercise of that power, and the performance of that trust and duty.  In what way did the Government of the United States become divested of this power and discharged of this trust?  The answer which the respondents' counsel would give is, that certain officers appointed by a military commander had done that which the United States themselves could not do; that these petty officers, appointed in the extraordinary state of things brought about by the war, had granted this land to another party.  The proposition is monstrous.

We contend, on the contrary, that the grant by the Alcalde of lands which had been granted to another was in itself void.  (*Lyttle* v. *The State of Arkansas,* 9 How. 315.)

It is curious to note the different effects which the respondents' counsel attaches to a grant by the Alcalde and a grant by the Governor.  In his view, an Alcalde grant operates instantly to convey a perfect title.  He admits that the Governor had the same right to grant, but contends that that grant conveyed no title until confirmation by the Departmental Assembly.  So if a grant is made by the Governor and on the next day a grant for the same land is made by an Alcalde before confirmation of the Governor's grant, the Alcalde's grant supersedes the grant of the Governor, and vests a perfect title in the claimant under the Alcalde.  The effect of this proposition would be that all grants within the limits of the pueblos would be rendered inoperative by the exercise of the power by the Alcaldes to grant away the same lands.

There is scarcely any land within the limits of any of the pueblos that has not been thus granted away.

It is contended that a patent for land is void which has been issued for land that had been previously granted in fee simple to another. The position, if true, is only applicable to patents issued for lands which had been granted as floats, and certainly does not apply to grants such as the one on which the patent to Leese and Vallejo was issued.

It is said that where a patent is issued by officers of the United States, that whilst the presumption is that it is valid, yet that that presumption may be rebutted by showing that the officers had no authority to grant on account of the lands not being subject to disposition. Now we can readily see how Leese and Vallejo might contend as against the Alcalde grant that this land was not liable to disposition, but we cannot see how the grantee of the Alcalde can invoke this principle in his behalf.

We maintain that the right to survey was a right that pertained to the political department of the Government, and that a junior grantee must be supposed to take his grant with a full knowledge of the prior grant, and of course with a knowledge of the right and duty of the Government to locate that prior grant. When the junior grantee obtains his grant, he takes it subject to the power of the Government to make the location of the prior grant. ( *White* v. *Burnly*, 20 How. 235 ; *Hancock* v. *McKinney*, 7 Texas; *Swift* v. *Herrara*, 9 Id.)

*Edmund Randolph*, also for Appellant.

*J. B. Haggin*, also for Appellant.

I. The principal question is, whether in the Act of Congress of 1851, organizing the Land Commission, the Government acts merely as proprietor of land, or whether it acts as sovereign, executing other powers of government than those which result from its ownership of the public domain. In passing upon the effect and right construction of the act, it is deemed important to inquire into the character in which the Government acts.

By the treaty of Guadalupe Hidalgo, the United States became

the owner of the public property in and the national sovereign of the present State of California. The old allegiance and authority ceased, but not the old rights of property; the new government in acquiring dominion took with it the duty of protection; it assumed not the forms or the modes, but the substance of the obligations which Mexico owed to the people of California. The treaty was between Mexico as a nation and the United States as another nation. The United States as a nation having power to make a treaty, it follows that not only had it the power, but it devolved upon it as a duty to execute the treaty. A treaty is a contract, to be construed according to its true spirit and meaning and legal effect, as these are given not merely by the words but by the laws of nations applicable to the subject. Whatever duties or obligations are imposed by a treaty, according to those laws, go with a treaty and form part of it, whether those duties are expressed or not in the instrument evidencing the treaty, and it is a universal rule that every sovereign, not especially restrained in this respect, has the power to execute its own obligations by its own direct act and in its own appointed way.

The rights and obligations which relate to property, and which bind the sovereign, are not destroyed by the cession of the country in which they are, but the first continue and the last attach to the succeeding sovereign. Whatever rights of property existed in California in 1847, and whatever obligations on the part of Mexico to respect them, fell with the cession upon the United States. It is true that the duty of protecting property might be devolved by the Federal Government upon other agencies, but this does not show that the power does not exist in that Government. The treaty power is unlimited in terms. (*Forbes* v. *Scannell*, 14 Cal. 283; *People* v. *Gerke*, 5 Id. 381.)

The effect of the treaty must be as we contend. Nations treat as equals and sovereigns; they profess to know nothing of the internal organization of each other's government, its departments, or its division of powers, or the relations of the parts to the whole, or the members to the head. The power making the treaty is the nation—sovereign to perform the contract—alone responsible, and therefore alone sufficient to keep its engagements.

That the law of nations does carry with a treaty this duty to protect the persons and property of the citizens of the ceded territory to the other contracting party has been often affirmed. (*U. S.* v. *Perchman*, 7 Peters, 87.)

There is nothing in the Act of 1851 which shows that the United States acted as mere proprietor; on the contrary, the act shows that it was passed in execution of the treaty of Guadalupe Hidalgo. So far from purporting to be an act to segregate the public lands of California, the title is: "An Act to Ascertain and Settle the Private Land Claims in the State of California."

It follows that even if the treaty were silent as to this protection to property, or if it only guaranteed on the part of the United States a partial protection, yet, as the laws of nations carried the obligations resulting from the treaty to the Government of the United States, it had a right to pass this act for the purpose of giving full effect to the preëxisting rights of the subjects of the ceded territory, and that it rests with Congress to determine the means and agencies in giving that protection.

No claim is to be presented by the United States, or any information or other proceeding taken at the instance of the Federal Government: "Sec. 11. The commission shall be governed by the treaty of Guadalupe Hidalgo, the laws of nations," etc. If the treaty expired and spent its force on the admission of California, how could the decision of the commission be governed by the treaty, and what particular provisions of the treaty had reference to the claims to be presented? (See Art. 8 of the Treaty.)

The language of the third paragraph is significant. It assures foreigners (Mexicans) inviolable respect to their property, and all vendeez (foreigners) shall have the same protection. There is no limitation to this provision until California is admitted as a State. Is it to be supposed that the treaty is in effect less full and less favorable in behalf of those who become citizens of the United States? Now the ninth section comes in, and is to be construed in connection with what goes before. It contains a new stipulation— that of admission into the Union, and the enjoyment of all the rights of citizens of the United States, according to the principles of the Constitution, and in the meantime that of being maintained and

protected, etc. This last clause was merely precautionary. It
had no effect in qualifying the first paragraph of the eighth arti-
cle, which guaranteed to Mexicans residing in the territories at
the date of the treaty the right to retain the property they pos-
sessed, whether they remained or left. If they remained, they
could be either Mexican or American citizens. But they had a treaty
right to retain their property. The ninth section was not designed
to interfere, or to qualify this guaranty, for that section was sub-
stantially and mainly inserted in order to secure them in any inde-
pendent local government, and to prevent any inference that this
was all the government that was to be afforded them, it was further
added that they were to be maintained, etc.—meaning that the
Federal Government was to secure the great privileges for which
government is instituted by providing the proper institutions. The
ends are referred to as the means. But it is plain that this did
not do away with the first stipulation giving them a treaty right
to their property. On the other construction, this absurdity ap-
pears: Mexicans who went away having property here are pro-
tected for all time, while those who remained are not.

It is said that *City of New Orleans* v. *Armas*, (9 Pet. 234)
is opposed to this view. We think not. In the first place, if the
dictum of C. J. Marshall be a direct decision, it is answered by
numerous contrary rulings of the same high Court. In *United
States* v. *Sutherland*, (19 How. 365) the Court says: " But the
United States have bound themselves by a treaty to acknowledge
and protect all *bona fide* titles granted by the previous Govern-
ment" (of Mexico). (*United States* v. *Fossatt*, 21 How. 448.)

In the next place, there was no point as to any other provision
of the treaty, except that cited, which is similar to the one in the
ninth section of the treaty of Guadalupe. Here we rely upon dis-
tinct and independent provisions, and the whole treaty. But that
was a mere question of jurisdiction; and the Supreme Court could
not have taken jurisdiction merely because property was involved
which the treaty might or should protect. The adverse claimants
held under a different claim, but one which, if good, fell within the
protection of the same treaty. If the United States Court had
jurisdiction, it would have jurisdiction of all cases involving prop-
erty of every sort existing at the time of the treaty.

The Chief Justice does not pretend, even upon the Louisiana treaty, that Congress could not pass a law by virtue of express or implied obligations of the treaty, protecting property, or giving satisfactory assurances to the holder of it.

If we are correct in the view that the Act of 1851 is an act of the sovereign, executing a sovereign power and obligation, then it is of course a constitutional law, and effect must be given to it as such. And having established, by political act, this means of performing a political function, the acts of the Government officers are conclusive of every thing within the range of their jurisdiction—which was in this case to " ascertain and settle " a particular title ; which by its own action was forced into its own jurisdiction, and is now conclusively " ascertained and settled " by its determination.

II.   In reference to the question, whether the holder of an American Alcalde grant is a third person within the meaning of the fifteenth section of the Act of 1851, we say :

That as it is left to Congress, and through Congress to the political department and the Courts to carry into effect the treaty, and in doing this, to ascertain the right and define the claim granted to the Mexican grantee, this action necessarily takes effect upon the claim in its origin, and the adjudication and patent are an affirmance of the very claim presented.   This proceeding is conclusive as to all claims held under the American authorities. These are all taken under the American Government, and subordinate to the power and duty of that Government to give effect to the treaty.   If the United States held the title to these lots in the same way these Alcalde grantees hold it, no question could arise that the adjudication would conclude them ; and there is no difference in this respect between the United States holding and the mere voluntary grantee of the United States, or what is the same thing, the grantee of an officer existing and acting merely by authority of the United States, or by their sufferance.   After the military occupation of California, Mexico ceased to rule ; the Government was that of the United States, though the laws administered were the old laws of Mexico.   It matters not that the treaty was ratified after this occupation and after these Alcalde grants.   The treaty took effect upon the property as it was when Mexico ceased

to control it.   It protected all property of which the United States took possession.   The temporary occupation either gave the United States officials no authority at all to dispose of the public domain, or else it gave such authority, subject to the power of the General Government to make a treaty which would enable it to fulfill all of its obligations as the successor of the former Government.

Now why are not the city and these claimants " third persons " within the meaning of the rule invoked ?   They claim that the original grants were invalid ; that for various reasons they pass no title ; that the boundaries are improperly assigned.   They say they took their titles before the issuance of the patent; that at the time they took the city really had the title ; that this title passed to them ; that therefore, being " third persons," they can contest with the grantee every fact settled by the decree and patent.

More than this, any patent may at any future time be contested, whenever a squatter can get a certificate of entry, or a swamp and overflowed warrant, or whenever he can get a school warrant and have it located ; for the argument would be the same as in this case, that the United States saved all the rights of third persons ; that a claim under the United .States was a claim of a third person ; that the United States gave to the State the swamp and overflowed lands ; that the title of the State is good, unless the grantee had a better title before.   And the assailant proposes to show that this was not the case.   Every patent that issues after the grant to the State of swamp land or school lands may be collaterally impeached !

The flagrant error of the respondents is, that their definition of " third person " applies to any one in privity with the Federal Government—especially a voluntary alienee of that Government.   The words used to denote the class of claimants are not descriptive of the persons of the claimants, but of the nature of their claims ; in other terms, the object of the law is to show the relation of the title of the contestant to the title of the confirmee.   *Third* in this sense means *independent*, or, as we express it, outside.   It is not that any one except the parties to the contest in the Land Commission— *i. e.*, the claimant and the United States—may contest, but saving the rights of third persons—that is, of those persons who do not

stand in privity with the United States—as the claimant.     Was it ever heard that the voluntary grantee of the United States can dispute with the United States the title which the United States had declared by unquestionable right to be before in another ?     As this Alcalde grantee only takes the bare claim of the United States— for the title of the pueblo was only usufructuary—he took that claim subordinate to the title of the Mexican grantee, and subordinate to the power of the United States to declare the title of the Mexican grantee and to settle and adjudicate that title ; the Alcalde grantee therefore is in direct privity with the United States, because the United States not only never parted with the control of this property, but expressly reserved their power over it.     The grantee under these circumstances is holding under the United States, and is as much bound as if he had acknowledged himself tenant at will.

When this Court concedes, as in *Teschemacher* v. *Thompson*, that the General Government obtained or acquired by the conquest or treaty a power to definitely decide upon the title of land acquired from Mexico, this was equivalent to saying it retained the title for all practical purposes ; for there is no difference between controlling and adjudicating the title by decree and fixing it by sale.     He who, after the conquest, took under it a pretended claim, took in subordination to the Government, and therefore in privity with and bound by its action.     He is not a third person, therefore, but a subordinate, with no primary rights, but only secondary—not independent in his claim, but subject.

If the section applies to the defendant, it does not give him a right to contest the patent at law, and in this collateral way.     But for the section, it is clear that he could not impeach it at all.     The whole reasoning of *Teschemacher* v. *Thompson* goes to this conclusion.     The thirteenth section of the act provides for contesting the patent in the District Court of the United States, and provides for an injunction until the title shall be finally decided. The fifteenth section, it is true, says that the final decree or patent shall not affect third persons; but this by no means gives to the contestant the right collaterally to impeach the patent. This right may as well be given to the contestant, and exercised by him in a direct proceeding.     But who ever heard of a collateral

attack upon decrees; and how, if attacked, can these patents and proceedings be maintained? Are they to be tried in the Justice and County or District Courts, on the principles of the laws of nations, the treaty of Guadalupe, the moral and equitable considerations which governed the Courts of the United States? Are they to be treated as inchoate claims on the conscience of the Federal Government? If differently tried, what avail is the patent to be, or what is its protection? How is the claimant to assert and prove his rights? Every principle of public convenience and policy is in favor of holding the patent not impeachable collaterally. See *Doe et al.* v. *Wilson*, (23 How. 463) to the effect that the recitals in a patent of land, that the land patented is the same as that reserved, is conclusive. We understand this to be decided by the Supreme Court of the United States in the case of *Greer* v. *Mezes*, (Dec. Term, 1860, S. C.) The Court says that if the survey was wrong, so as to trench on defendant's boundary, and the error was occasioned by mistake or fraud, the party complaining might file a bill under the thirteenth section of the Act of 1851, but that he could not in an action of ejectment disturb the boundary as fixed by the patent and survey. This principle seems independent of Coppinger's title, being merely equitable. We call attention to this opinion.

If all these views fail, we still insist that the Alcalde grants are worthless, because the Alcalde had no right to grant within two hundred varas of the beach.

*O. C. Pratt*, for Respondents.

I. The Court did not err in directing the jury to reject the patent, provided they should find from the testimony that the lots sought to be recovered were city, town or village lots of a city, town or village existent July 7th, 1846.

1st. The Board of Land Commissioners, created under the Act of Congress of March 3d, 1851, was a tribunal of limited jurisdiction, and only authorized to act upon such claims and cases as were delegated to it, and permitted by the law conferring its powers.

On the point in question, the language of the fourteenth section —plainly intended as a limitation of the powers conferred by the

eighth section—is explicit. The words of section fourteen are:—
" That the provisions of this act shall not extend  *  *  to any
city, or town, or village lot, which city, town or village existed on
the seventh day of July, one thousand eight hundred and forty-six;
but the claim for the same shall be presented by the corporate au-
thorities of the said town."

Nothing, as we conceive, but an ingenious perversion of the
clear intent of the law-maker, manifested in the simple words ex-
pressive of such intended limitation of powers conferred upon the
Board, can be urged in support of the assumed authority to adjudge
the question of a claim to town or village lots of a town or village
existent July 7th, 1846, and we suggest that such forced construc-
tion has not the merit of plausibility.

Counsel for appellant says the fourteenth section does not sup-
port the charge of the Court, and that it is obvious the section did
not contemplate a grant by a Governor; and that it was intended
to aid those who derived their titles through the common medium of
the former officers of the pueblo; and that the language of the sec-
tion shows that it was not place, but source of title which distin-
guishes what shall be considered as town lots, village and pasture
lots, from any other lands.

A common source of title to village or town lots of a town or
village existent July 7th, 1846, through which claimants might
claim to derive their rights to lots comprising the locality where the
town or village was situated, is neither within the meaning, much
less the words of this fourteenth section, which prohibits the Board
from inquiring into and passing upon the claims of parties to town
or village lots of towns or villages established when the country was
seized by the Americans. The act proceeded upon the presump-
tion that lands embraced by a town or village, existent when the
American flag was raised, were not a part of the public domain;
and that as a consequence the United States had no interest in and
to such lands to be determined by the Board or any of the tribunals
authorized to exercise jurisdiction in separating and distinguishing
private claims from the public lands. Lands occupied as town sites
were not assumed to belong to the Government, nor was it pre-
sumed that the Government had the slightest interest either in the

question of how or when such lands had been segregated from the mass of the public domain, or interest in the rights of the individual claimants to them, or any part of them ; and hence the positive inhibition contained in the fourteenth section against the United States tribunals inquiring into and determining the rights of claimants to village or town lots in any manner, or for any purpose.

2d. It is indisputable that the authorities of pueblos had power to grant lands of the pueblos in fee to applicants. The same power may have existed in the Governor of the Department, in order to promote the settlement of the town. Assuming that the power was coëqual in both, and that the Governor in a given case had attempted to make a concession of a town or village lot, but such attempted concession had not passed the fee by reason of uncertainty of the description, and that there was no actual possession taken, or judicial possession given, under the concession of any specified lot or tract, it then would be deemed at most that such attempted concession would amount only to a simple equity, and could carry with it the fee to nothing. Suppose, further, that the concessionee had even built a temporary or other structure on what he supposed to be the place intended to be conceded ; that soon afterwards the erection was removed or destroyed, and the locality where it stood, as well as the surrounding neighborhood for many hundred yards distant, was entirely unoccupied for any purpose by anybody, and continued so unoccupied and abandoned by any use whatever for seven years and upwards ; that thereupon the pueblo authorities, having full power to grant the fee to lands within the pueblo limits, where the fee had not been previously granted, should grant in full property a specific, surveyed and well defined village lot of fifty varas square, lying in the immediate neighborhood where said house or structure had been erected many years before by the former equitable claimant, and even embracing the very spot where the former erection had stood ; in such case it is obvious that a vested right in fee would exist to the particular fifty vara lot in the grantee of the pueblo authorities. Clearly the United States, as the successor of Mexico, could not divest such vested right of the pueblo grantee by any act of legislation, decree of its Courts where such grantee was not a party, or survey made by the United States

Leese *v.* Clark.

authorities wherein he had no voice or act, and embracing his fifty vara lot.

There can be no doubt that under a proper construction of the Act of March 3d, 1851, when applied to cases within its objects, such as confirmation, surveys, patenting of ranch or rural property, and thereby separating such property from the mass of the public lands, a patent issued for a particular tract is conclusive evidence of right to the same in the patentee, not only against the Government issuing it, but as against all other parties who had not a right in fee to the same land before the issuance of the patent; and this may be so as well where the patent covers more or other land than may have been originally granted, as where it is confirmed to the identical land embraced by the grant, because the United States may, when dealing with their own land, dispose of it as they please. Land not granted in fact by the former sovereign or rightful authorities acting under its laws, may be disposed of in fee by the new sovereign, and the patent is conclusive as against the sovereign issuing it, that the fee embraced by it had been parted with. The doctrine of *Moore* v. *Wilkinson* (13 Cal.) proceeds upon that view and no other, and has no proper application to the case before the Court.

If then we are correct, it follows that the proceeding had before the Board by Leese and Vallejo touching these town or village lots was unauthorized by law, and all the subsequent steps based thereon, including the issuance of the patent, were simply void and unavailable for any purpose. (*Patterson* v. *Winn*, 11 Wheat. 380; *Stoddard* v. *Chambers*, 2 How. 284.)

II. But if mistaken in the jurisdictional question, and the Board, notwithstanding the inhibition of the fourteenth section, did rightfully take cognizance and make decree of confirmation to plaintiff and Vallejo, as against the United States, of the lots in question, then it is contended no error was committed by the Court.

1st. The defendants are "third persons" within the meaning of the fifteenth section of the Act of March 3d, 1851, whose interests the decree of confirmation and patent do not affect. The defendants acquired in 1847, through the rightful municipal author-

ities, the fee to the lands described in the complaint, provided always that it had not been previously granted. What was a grant was a matter of law, but what had been granted was a question of fact. Before the Board, as between the claimant and the United States, both were determinable by that tribunal; but as between the claimant and rightful " third persons," neither the determination of the question of law or of fact, involved in the claim sought to be confirmed by the Board, would or could in any respect operate a divestiture of the fee to any given tract out of such third parties, and invest it in the claimant. In a word, if the fee to the *locus in quo* could pass and did pass by municipal grants, and was in the defendants in 1847, no prior but imperfect concession, although made by rightful Mexican authorities, would affect it, even if such prior concession was for the same land.

What was embraced then by any alleged grant was in proper cases a question of fact, which by the law of March 3d, 1851, was necessarily left to rightful third persons to contest with the patentee, notwithstanding confirmation by the United States tribunals, the survey of the tract claimed, and the issuance of the patent. This was so in the very nature of things, even without reference to the explicit provisions of the act itself declaring the reservation of such rights, and limiting the effect of patents to be issued to claimants under it.

The question of fact as against defendants, claiming the tract in fee covered by the patent, must be determined, not by the patent, but by the grant which was its foundation.

What land was embraced by the grant must then of necessity, in a case like this, have been ascertained by the proofs. The evidence in that respect was full, and the jury were unable from it to locate the land.

2d. The third persons against whose rights and interests the action of the Government and patent are not conclusive, are those " whose title accrued before the duty of the Government and its rights under the treaty attached." See the case of *Teschemacher et al., Executors,* v.. *Thompson* (18 Cal. 11) for a definition of " third persons " mentioned in the fifteenth section of the Act of Congress.

The defendants claim through Alcalde grants, under which they went into possession. These grants were made in 1847, and the rights and duty of the U. S. Government in the premises only began and attached in May, 1848, at the date of the treaty of Hidalgo.

Field, C. J. delivered the opinion of the Court—Cope, J. concurring.

This is an action of ejectment to recover the possession of two lots situated within the city of San Francisco. The plaintiff counts upon a grant made to himself and Salvador Vallejo, in May, 1839, by Juan B. Alvarado, then Governor of California, and a patent of the United States issued upon its confirmation, in March, 1858. The petition presented to the Governor, and upon which the grant issued, solicits a concession of two lots of one hundred varas each, situated at the Desembarcadero, or landing place of Yerba Buena, and describes them as commencing at the point of the Desembarcadero on the sea shore, and running thence in a northerly course to the Playita or little beach, making a front of two hundred varas, and a depth in a westerly direction towards the hill of one hundred varas. We do not use the exact language of the translation given in the record, but state its manifest purport. The grant concedes to the petitioners the two lots at the place and with the bounds designated. The claim under the grant was presented to the Board of United States Land Commissioners for confirmation in February, 1852, and was by the Board adjudged to be valid, and confirmed in February, 1856. The case having been carried by appeal to the United States District Court, the Attorney General gave notice that the appeal would not be prosecuted, and upon the stipulation of the District Attorney to that effect, the Court in April, 1857, ordered the appeal to be dismissed, and allowed the claimants to proceed upon the decree of the Board as upon a final decree. In May following an official survey of the lots was made under the directions of the Surveyor General, and approved by him. Upon the approved survey and decree of confirmation, the United States issued to the claimants their patent of the lots, with the specific description of the official survey. The

premises in controversy are covered by this patent, and it is admitted that the defendants were in their occupation at the commencement of the action. The interest of Vallejo had been previously conveyed to the plaintiff.

To meet the case thus presented, the defendants produced sundry grants of the same premises, in lots of fifty varas each, made to them or their grantors in 1847 by persons then acting as Alcaldes or Chief Magistrates of the Pueblo of Yerba Buena, or town of San Francisco, and contended that the Board of Land Commissioners had no jurisdiction to pass upon the claim of the plaintiff and Vallejo under the grant of Alvarado, and as a consequence, the subsequent action of the District Court, of the Surveyor, and of the authorities at Washington in issuing the patent, were without authority and void ; or, if the Board had such jurisdiction, that the defendants, claiming under the Alcalde grants, were third persons within the meaning of the fifteenth section of the Act of Congress of March 3d, 1851, against whom the decree of confirmation and patent were not conclusive, and that they were in consequence as much at liberty to question the location of the premises as if the grant had never been before the Commission. Proceeding upon this view of the jurisdiction of the Board, and the construction of the fifteenth section, the defendants directed their proof to show that the premises in controversy were not embraced by the grant in question. The evidence as to the locality of the starting point of the premises granted, known in 1839 as the Desembarcadero or landing place of Yerba Buena, was conflicting. The jury found for the defendants, on the ground, as stated in their verdict, that they could not locate the grant as claimed by the plaintiff.

This Court has held, in repeated instances, that at the date of the conquest of California, which is considered as having been effected on the seventh of July, 1846, and previously, running back as far as 1834, San Francisco was a Mexican pueblo, and the objection to the jurisdiction of the Board and the validity of the patent was based upon the fact that the lots granted to the plaintiff and Vallejo were within the limits of this pueblo. The Court below instructed the jury, in substance, that if the land described in the patent were city, town, or village lots of a city, town, or

village in existence on the seventh of July, 1846, then neither the Board nor the District Court had any jurisdiction of the claim, and the patent issued for such claim was of no validity, so far as .it affected the interests of the defendants, unless the land was granted previous to the existence or for the purposes of the city, town or village ; and further, that if the jury found that the premises were, at the time they were granted, within the pueblo limits, then they were town lots within the meaning of the Act of Congress ; and, in that case, the jury must exclude from their consideration the patent of the United States, and could not base their verdict upon the description of the premises or anything it contained.   In other words, the Court instructed the jury, that if the lands granted were within the limits of the pueblo, they were town lots within the meaning of the Act of Congress, and if town lots, the claim to the land was not within the jurisdiction of the Land Commissioners, and the patent was issued without authority, and must be excluded from their consideration, as far as it affected any interests of the defendants.

These instructions were confessedly based upon the fourteenth section of the Act of Congress of March 3d, 1851, but are not in our judgment warranted by its provisions.   The jurisdiction of the Commission over land claims arises from the eighth and fourteenth sections of the act.   The eighth section requires *every* person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican Government, to present the same to the Commission.   The fourteenth section qualifies the general language of the eighth section, and excludes from its provisions lots held under grants from any corporation or town to which lands had been granted for the establishment of a town by the Spanish or Mexican Government, and also lots held or claimed by any city, town or village which was in existence on the seventh of July, 1846, and provides that the claims for the same shall be presented by the corporate authorities of the town, or if the land upon which the city, town or village was situated was originally granted to an individual, in the name of such individual.   The evident object of this section was to aid lot holders who claimed title from a common source— from the authorities of a pueblo or town, or from an individual who

was originally the grantee of the land upon which the pueblo or town was built—and to prevent the necessity on the part of the Commissioners of considering a multitude of separate individual claims for small tracts, all of which depended upon the validity of the same original title. The confirmation of the common title in such cases would of course inure to the benefit of all parties holding under the claimants, for between them there would exist privity of estate. We do not consider the second provision of the section as embracing all lots situated *within the limits* of a city, town or village, which existed on the seventh of July, 1846, but as embracing only the lots belonging to or claimed by such city, town or village, thus authorizing the corporate authorities to present under one general claim the interest of the city, town or village, and the separate interests of individuals under concessions from those authorities. The section, it is true, is not free from ambiguity, and for that reason such construction must be adopted against the literal meaning of the language used as will reconcile apparent inconsistencies, give sense to each part, and carry out the purpose of the entire act. The first clause of the section, for instance, declares that the provisions of *the act* shall not extend to any town lot, etc., and yet subsequent clauses of the same section designate the manner in which claims to such lots shall be presented. Thus the same section apparently excludes the jurisdiction of the Board from these cases, and at the same time provides for their presentation to the Board for its consideration. But from other provisions and the general object of the act, it is evident that it was only the intention of Congress to distinguish the mode in which the claims designated in this section should be presented from the mode required with respect to individual claims by the eighth section; and hence, the general language of its opening declaration must be restricted and held to apply only to the provisions of that section. So the second provision of the section cannot be construed, notwithstanding its comprehensive terms, to require the claim to every city, or town, or village lot—where the city, town or village existed on the seventh of July, 1846—to be presented by the corporate authorities, simply from the fact that they are *within the limits* of such city, town or village, without reference to the title by which they are held, as such

Leese v. Clark.

construction would in many instances defeat the very object of the act, and instead of settling would effectually destroy the rights of the lot holders. The confirmation of a claim, whether made to corporate authorities or to individuals, could only be for the benefit of the claimants or parties deriving title through them. It could not of course inure to the benefit of parties holding adversely to the title confirmed, as there would exist no privity of estate between them and the confirmee. If the adverse claims were mere equitable interests, as in many instances is the case, the confirmation followed by a patent would entirely extinguish them; and it would thus follow that the Government, instead of discharging its obligation under the treaty and protecting the equitable interests of its citizens, would have provided for their effectual destruction in numerous cases. It may be said in answer to this, that protection to such adverse interests could be secured by the form of the decree —by the insertion of distinct clauses of confirmation to the owners. But if this were possible, it would be attended with infinite embarrassment and inconvenience. It would be necessary, in the first place, for the corporate authorities to present the separate claim of each lot holder, with as much fullness and particularity, and accompanied with the same documentary evidence required of individual claimants by the eighth section; and to do this the authorities might not possess the information or the means. In the second place, each claim would call for separate examination, discussion and judgment on the part of the Board, and all the claims being presented in one proceeding would furnish inconsistent and contradictory propositions for consideration, and produce a confusion such as would follow from blending in one complaint different causes of action between different parties. With the single exception of the location of the different lots claimed within the limits of the town, there would be little in common, either in the allegations or proofs. Such a result could not have been contemplated by Congress in the provision in question. Nor could Congress have ever intended to subject the corporate authorities to the expense of establishing the title of third parties, with which they have no connection, but which is adverse to that of the city, whose interests they are supposed to represent and protect.

37

For these reasons, we are of opinion the Court erred in its construction of the second provision of the fourteenth section, and that the fact that the premises described in the grant of Alvarado and patent of the United States were town lots of a pueblo existing on the seventh of July, 1846, or at the date of the grant, on the twenty-first of May, 1839, did not exclude the claim of the grantees from the jurisdiction of the Board, or require the presentation of their claim by the corporate authorities. It is only where the lots are held under concessions from such authorities, or belong to the pueblo, that the claim must be presented as required by the fourteenth section. Leese and Vallejo did not hold or claim under any corporation or town, but directly by grant from the Governor, and their claim is not therefore embraced by the provisions of the section in question when that section is properly construed. It was a claim to be presented under the eighth section of the act; it was so presented, and jurisdiction, in our opinion, was rightfully taken of it by the Board.

A similar construction was given to the fourteenth section by the Board in the consideration of the claim presented by the city of San Francisco, and its jurisdiction to pass upon claims of individual lot holders under grants from the former Governors, upon their separate presentation, has been asserted by it in repeated instances, and this jurisdiction has been recognized by the United States District Court. A denial at this day of such jurisdiction, and the validity of proceedings consequent thereon, would lead to the disturbance of numerous titles, and injuriously affect vast interests within the limits of the city. We have no doubt of the jurisdiction, and that to the patent, issued to the plaintiff and Vallejo, the same operation and effect should be accorded as to any other patent, regular upon its face, issued by the United States, upon the confirmation of a claim under a Mexican grant, pursuant to the Act of Congress of March 3d, 1851.

As to the operation and effect of this patent there can be no question. It is the last act of a series of proceedings taken for the recognition and confirmation of the claim of the patentees to the land it embraces, the first of which was the petition to the Board of Land Commissioners. With respect to such proceedings

it takes effect by relation at the date of the first act.   As the deed of the United States, it is to be regarded as if it had been executed at that time.   It passes whatever interest the United States may then have possessed in the premises.   It operates in consequence as an absolute bar to all claims under the United States, having their origin subsequent to the petition.   (See *Moore* v. *Wilkinson*, 13 Cal. 478 ; *Yount* v. *Howell*, 14 Id. 465 ; *Stark* v. *Barrett*, 15 Id. 362 ; and *Ely* v. *Frisbie*, 17 Id. 250.)

But the patent has a still further operation and effect.   It is not merely a deed of the United States, conveying whatever interest they may have held in the premises at the institution of proceedings before the Land Commission.   It is also a record of the Government, showing its action and judgment with respect to the title of the patentees at the date of the cession.   By the treaty of Guadalupe Hidalgo, the United States in effect stipulated for the protection of the rights of property of the inhabitants of the ceded territory.   Independent of treaty stipulations, the inhabitants were entitled to such protection by the law of nations. The obligation thus devolved upon the Government upon the acquisition of the country was political in its character, and to be executed in such manner as the Government might judge expedient.   To execute this obligation necessarily required an inquiry into the nature and extent of the claims asserted to property at the date of the treaty.   This inquiry involved something more than an investigation into the genuineness of the title papers of the patentees ; it also involved an ascertainment of the quantity, location and boundary of the property claimed.   Thus in the case of the *United States* v. *Fossatt*, (21 Howard, 449) Mr. Justice Campbell, in delivering the opinion of the Supreme Court, said : "In affirming a claim to land under a Spanish or Mexican grant to be valid within the law of nations, the stipulations of the treaty of Guadalupe Hidalgo, and the usages of those Governments, we imply something more than that certain papers are genuine, legal and translative of property.   We affirm that ownership and possession of land of definite boundaries rightfully attach to the grantee."   By the Act of March 3d, 1851, the Government provided the means for the ascertainment of the character and extent of the titles

alleged to have existed previous to the cession.   It established a tribunal before which all claims to land were to be investigated; prescribed rules for its action; required evidence to be presented respecting the claims; authorized appeals from the decisions of the tribunal, first to the District and then to the Supreme Court, and appointed officers to survey and measure off the land when the validity of the claims had been finally affirmed.   Informed by the proceedings thus had before its tribunals and officers, the Government regulated its conduct, and to the successful claimant issued its patent.   This instrument, as we have stated, is the record of the Government upon the title of the patentee to the land described therein, declaring the validity of that title and that it rightfully attaches to the land.   Upon all the matters of fact and law essential to authorize its issuance, it imports absolute verity; and it can only be vacated and set aside by direct proceedings instituted by the Government, or by parties acting in the name and by the authority of the Government.   Until thus vacated it is conclusive, not only as between the patentee and the Government, but between parties claiming in privity with either by title subsequent.

The defendants do not question the genuineness of the grant to Leese and Vallejo, but its location.   They contend that as to such location they are "third persons" within the meaning of the fifteenth section of the Act of March 3d, 1851, and as a conse-quence, that the patent is not evidence of such location against them.   To determine this question, it is necessary to inquire into the nature of the title to the premises, which, it is alleged, they acquired by their subsequent grants; for the "third persons" within the meaning of the section referred to, who can controvert the location of a grant upon which a patent has issued, are those whose title to the premises patented not only accrued before the duty of the Government and its rights under the treaty attached, but whose title to such premises was at that date such as to enable them to resist successfully any subsequent action of the Government affecting it.   (*Teschemacher* v. *Thompson*, 18 Cal. 27; *Waterman* v. *Smith*, 13 Cal. 420.)   The defendants claim under grants issued previous to the treaty, in 1847, by persons acting as municipal officers of the Pueblo of San Francisco.   It is alleged that those officers possessed

authority under the laws of Mexico, which were not abrogated during the military occupation of the country, to make grants of land within the limits of the pueblo—in other words, to transfer the title of the pueblo.   We shall assume for the purposes of the present appeal that they did, in fact, possess such authority.   But the political head of the department of California also possessed a like authority, and exercised it in numerous instances, as the archives of the country abundantly establish ; and his authority was paramount— that is to say, its exercise could not be interfered with, or in any way defeated by any subsequent action of the pueblo or its officers. In *Hart* v. *Burnett,* (15 Cal. 549) this Court, in speaking of the grants of land made by the former Governors of California within the limits of pueblos, said : "The whole matter was subject to the control and discretion of the Governor and Territorial Deputation, and the official acts of such officers, within the general scope of their powers, are presumed to have been done by lawful authority."   And in considering the general character of the right and title which a pueblo acquired to the lands which, within the limits of four square leagues, were susceptible of such acquisition, and after referring to various documents and authorities, this Court, in the same case, observed that those documents and authorities were sufficient to show that pueblos had such a right and interest in the lands within their limits that they could distribute, concede or grant them in lots to individual settlers, "*subject, in this as in all other matters, to the instructions and orders which might be given them by the superior authorities.*" (15 Cal. 558.)   A great number of grants issued by Alcaldes within the limits of the Pueblo of San Francisco have been before us at different times, and they have almost without exception referred to the authorities of the department as the source of the granting power exercised by them.   This is the case in all the grants issued during the year 1847 which have been brought to our notice. Admitting the power of these *de facto* municipal officers to the fullest extent ever asserted by the present Court, it only extended to lands which had not been previously granted by the superior authorities of the department under the former government.   Nor does it matter in any respect whether the grant of those authorities passed a legal or an equitable title.   The moment they assumed

the control of the property and passed any interest in the same, all granting power of the subordinate officers of the pueblo with respect to the property ceased.

When the grant to Leese and Vallejo passed from the Governor and was received by them, there still remained another proceeding to be taken for the investiture of a complete title. The proceeding was a judicial delivery of the possession. Under the Mexican system this proceeding was an essential ceremony where there was any uncertainty as to the precise bounds of the land granted. That there was such uncertainty in the bounds of the tract, as described in the grant in question, is manifest. The location of the line running from the desembarcadero, or landing place, to the playita, or little beach, is one source of uncertainty. That line might be run in several different directions, materially varying from each other, and yet run in each instance in a *northerly* course from the starting point. There are other sources of equal uncertainty. A delivery of judicial possession was therefore necessary. This proceeding involved a definite ascertainment of the land to be delivered, and for that purpose required a survey and measurement—in other words, a location of the land. The power of locating the land, as preliminary to its formal delivery, belonged to the Government, and could not be exercised by the grantees, at least so as to bind the Government. They took with full knowledge of the right and power of the former Government in this respect, and in strict subordination to them. It does not appear from the record whether that Government ever acted in the matter. Assuming that it did not, the right and power passed to the United States, and could be exercised by them in such manner and at such time as they might deem expedient. The defendants, as junior grantees, took their grants with this knowledge :—that if the military occupation of the country ceased, and the displaced Mexican authorities were restored, they would only take, if in that event they were allowed to take at all, in subordination to the action of those authorities in the location of the elder grant; and that if the United States permanently retained possession of the country, they would take in subordination to like action of the new Government. By the Act of March 3d, 1851, the new Government designated the manner and

conditions under which the right and power of location would be exercised, and declared the effect which should be given to the proceedings had.   The defendants, taking whatever interest they may possess in subordination to the future action of the Government, old or new, in determining the location of the elder grant, are in no position to question those proceedings.   As the Government acted in this matter only through its appointed tribunals and officers, if it shall discover that imposition and fraud have been practiced upon them, and have produced a result which otherwise would not have been obtained, it may itself institute proceedings to vacate the confirmation and patent, and annul or correct the location.   But unless the Government interferes in the matter, the defendants, as junior grantees, are remediless.   Their title to the premises was not such at the date of the treaty as to enable them to resist the action of the Government in the location of the elder grant.   They are not, therefore, " third persons " within the meaning of the fifteenth section of the Act of Congress.

The language of Mr. Chief Justice Taney in *Fremont* v. *United States*, (17 How. 558) to the effect that a subsequent grantee of a tract with specific boundaries, within the general exterior limits of the grant in that case, would have acquired a superior and better title than the original grantee, has no application.   The grant in that case was of a specific quantity, lying within limits embracing a much larger quantity, and the Court gave as the reason for its language, that by the general grant the Government did not bind itself to make no other grant within the territory described, until the survey was made.   In the case at bar, the grant is of a tract with designated boundaries, uncertain, it is true, in their character, and to be ascertained and fixed upon the surface of the earth by the Government, but embracing no surplus quantity to be the subject of other grants.   There is no analogy between the two cases.

Judgment reversed, and cause remanded for a new trial.