## MOORE et al. v. WILKINSON et al.

WHERE a grant is for four leagues of land, within a larger tract, the right to measure off the specific quantity granted rested with the former government, and upon the cession, passed with other public rights to the United States. That right is political, and cannot be exercised by the judicial department.

Courts may ascertain and fix the position of boundaries which are designated, but cannot give boundaries to a specific quantity which has none, and lies in a larger tract.

The judiciary must determine whether the prior rights of third persons have been interfered with by the survey and patent, but it cannot correct the one nor the other. The survey and patent are conclusive in actions of ejectment.

Even though the title of a grantee, in a particular case, to a specifically described or designated tract be perfect, without further action by our government, yet if such action be had, and the grantee accepts the land described in his patent as satisfying his claim, no other persons can object that a portion of the land thus taken is without the boundaries of the grant, unless their prior rights are interfered with. This is a matter between the government and the grantee, with which strangers have no concern.

The survey and location are to follow the decree of confirmation. The approval of the survey by the proper officers is the determination—the judgment of the appropriate department of government that the survey does conform to such decree. That determination or judgment is not the subject of review by the judiciary. It is conclusive upon the Courts in actions of ejectment as the adjudication of a competent tribunal, upon a subject within its exclusive jurisdiction.

A patent cannot be attacked collaterally, even for fraud, whether charged to have existed in the procurement of the original grant, or in the proof of its execution, or in the making of the survey. For these matters the right of interference rests only with the government. Individuals can resist the conclusiveness of the patent only by showing that it conflicts with prior rights vested in them.

The 15th Section of the Act of Congress of 1851, provides that the final decree of confirmation and patent shall be conclusive between the United States and the claimants only, and shall not affect the interest of third persons. If conclusive between the United States and the claimants, it must be equally so between persons holding under either of those parties.

A patent takes effect, by relation, at the date of the presentation of the petition of the patentee to the Board of Land Commissioners. And where such petition was presented in March, 1852, at which time the pre-emption laws of the United States were not extended to California; the rights, if any, of parties, claiming under those laws, are subordinate to the result of the proceedings then pending by the grantee before the tribunals and officers of the United States.

Where claimants had, prior to the issuance of a patent, published a notice that they had become the owners of the grant, specifying its boundaries, and warning off trespassers; *Held*, that they were not estopped from claiming, under their patent, land outside of those boundaries.

*Query:* Whether such notice would protect third persons against any demand for damages until the approved survey?

APPEAL from the Ninth District.

Ejectment to recover land situated in Butte County. The plaintiffs claim title under a Mexican grant, and a patent of the United States, issued upon its confirmation. The following is a copy of the grant:

"*Pio Pico, Constitutional Governor of the Department of California:*

Whereas, the Mexican citizens by birth, Maximo and Dionisio Zenon Fernandez, have solicited for their personal benefit, a

tract of vacant land in the immediate vicinity of the river Sacramento, bounding on the north with the base of the Snowy Mountains, on the south with the land of Don Juan A. Sutter, and on the east with Feather River, having previously made the corresponding inquiries and investigations as are provided in conformity with law of 12th August, 1824, and regulations of 21st November, 1828, I have assented by decree of this date, in the exercise of the powers conferred upon me, in the name of the Mexican Nation, to grant to them the tract aforesaid, declaring to them the fee of the same by these presents with reservation of the approval of the most excellent Departmental Assembly, and under the following conditions:

1st. They may fence in the same without prejudice to the cross-roads and servitudes. They shall enjoy it freely and exclusively, dedicating it to the uses or cultivation which may suit them.

2d. They shall solicit from the respective Judge that he give them judicial possession, in virtue of this patent, by whom shall be marked out the boundaries by the necessary monuments.

3d. The land of which donation is made is merely four square leagues, (or four ranges of neat cattle,) in conformity with the map annexed to the proceedings, (*espediente.*) The Judge who may give them possession will cause the same to be measured according to the ordinance, leaving the remainder which may result to the nation for its proper uses.

I therefore ordain that, holding the present document of title as firm and valid, note be taken of it in the respective book, and it be delivered to those concerned for their protection and other purposes.

Given in the city of Los Angeles on this common paper, for the absolute want of stamped, the twelfth day of June, one thousand eight hundred and forty-six.

Pio Pico.

José Mateas Moreno, Provisional Secretary.

Note has been taken of this Superior Patent in the respective book.

Moreno."

On the trial the defendants, among other things, offered to

prove that two of the plaintiffs, and the grantor of the other plaintiff, on the 4th of March, 1856, published in the *Butte Record*, a paper of general circulation in the neighborhood where the premises are situated, a notice stating that they had become the owners of the tract of land known as the Fernandez grant, and setting forth its boundaries, and notifying persons not to trespass upon the tract. The notice was at the same time produced in connection with the offer of the defendants. The object of introducing it was to show that the plaintiffs did not claim, by the boundaries designated in the notice, the premises in controversy. The Court excluded the notice, and the defendants excepted.

All other material facts of the case are stated in the opinion of the Court. The plaintiffs recovered judgment, and the defendants appealed.

*Robinson & Beatty*, for Appellants.

I. If the grant was for a certain specific tract of land, defined by metes and bounds which were capable of being ascertained and accurately defined by the ordinary modes of judicial investigation, and the said boundaries contained four leagues and no more, then the grant of the Mexican Government conferred on the grantees a perfect title. As a corrollary to this proposition, the plaintiffs, having derived a perfect title from the Mexican Government, need not have presented their claim to the Board of Land Commissioners. It is true, that the Act of Congress requires all claims to be presented, and says that all lands not confirmed shall be " deemed held and considered " public domain. But this is a mere *brutum fulmen*. Congress could not pass a law forfeiting the property of a citizen without compensation, and for no crime but failing to do an act which should perfect a title which was already perfect. (*Lytle et al.* v. *State of Arkansas*, 9 How. 314.) If, however, the grantees had a grant for four leagues of land not defined by any specific boundaries, but contained within more extended boundaries — say within thirty leagues—then the question arises, who would have the right to segregate and select the four leagues out of the thirty, the grantees or the government? If the government has the right to elect, it has no right to go outside of the thirty leagues.

Moore *v.* Wilkinson.

It was suggested by the Court that this land, having been patented by the United States, the government would never advertise it for sale, consequently defendants could never get a title. This we think an imaginary difficulty. The land has been conveyed by the government to the plaintiffs by a sort of quit-claim, reserving the rights of third parties. The Appellants are third parties holding an equity against the government. The government patent passes the land subject to that equity. Appellants can tender the one dollar and twenty-five cents per acre, and file their bill to compel Respondents to deed the land. Or Respondents can file their bill to compel Appellants to pay the money or surrender their equity. We admit that, if this grant did cover an extent of thirty leagues, no pre-emption right could attach within that thirty leagues. But we offered proof to show that the land in controversy was outside of the utmost limits of the grant.

II. A pre-emptor who settles on public land under and by virtue of the United States laws, is, from the time of his settlement, a purchaser in good faith. He has a vested right, of which the government cannot deprive him by Act of Congress. His settlement and his improvement of the land are the consideration that he pays the government. (*Lytle* v. *State of Arkansas,* above cited.)

III. The notice published by two of the plaintiffs and the vendor of the third, as to the boundaries of their grant, was competent evidence, and should have been received. It was one link in the evidence to establish the allegation in the answer of the defendants, that they had made their improvements, "encouraged by the representations of the plaintiffs," that the premises "were public lands, and not included in any Mexican grant." If the plaintiffs did make such representations, they are estopped from claiming any back rents, and may be compelled to pay for improvements made by defendants, if indeed they are not estopped to sue for the land.

IV. The Appellants are the "third persons" mentioned in the 15th Section of the Act of March 3d, 1851, whose interests the decree of confirmation and the patent do not affect. If the Appellants held under the United States by right acquired *pen-*

*dente lite,* they would be privies. It can only be supposed that they acquired their rights *pendente lite* by confounding the acts of the Courts with those of the Surveyor-General. If, while the claim of the Respondents was pending before the Board of Commissioners, or the United States District Court on appeal, they acquired any right from the United States adverse to the claim then presented, they acquired it *pendente lite,* and the same would be barred by the decree against the United States. But they admit the validity of Respondents' claim, and the correctness of the decree in their favor. They abide by everything the Court and Commissioners did. The decree was a legal adjudication that the title was and had been a good one. After that adjudication, the political department of the government commenced to act, and they say, surveyed land not decreed to belong to Respondents.

If Respondents asked for one piece of land, and the Appellants finding litigation about that, bought another and different piece, this was not buying *pendente lite,* because there was no suit about the piece they bought. It was a suit between the same parties, but not about the same property. The Surveyor is in no way connected with the Courts or Board of Commissioners.

The first proceeding terminated with the final decree. If that decree was for this land, the Appellants cannot hold it, as they are purchasers *pendente lite.* But if the decree does not include it, then they are not precluded from setting up rights acquired before the survey was made. That was the first indication of a claim to this land. It is that survey they wish to contest, not the decree. They did not purchase pending the survey.

*Wm. H. Rhodes,* for Respondents.

I. By the treaty of Guadalupe Hidalgo, the United States reserved and incurred the duty of surveying and segregating the domain previously granted by the government of Mexico. (*West* v. *Cochran,* 17 How. 403; *Stanford* v. *Taylor,* 18 Id. 412; *Stoddard* v. *Chambers,* 2 Id. 316; *U. S.* v. *Sutherland,* 19 Id. 364; *Willot* v. *Sanford,* 19 Id. 80; *Menard's Heirs* v. *Massey,* 8 Id. 294; *Guitard et al.* v. *Stoddard,* 16 Id. 512.)

II. The grant having been confirmed, surveyed, and patented, the defendants cannot question the proceedings on the

ground of having, as third persons, rights to the land in controversy; the survey and patent are conclusive. (*West* v. *Cochran*, 17 How. 402; *Stanford* v. *Taylor*, 18 Id. 412; *Bryan et als.* v. *Forsyth*, 19 Id. 334; *Stephenson* v. *Smith*, 7 Missouri, 610.)

The terms "third persons," in the Act of Congress of 1851, do not apply either to the U. S. Government or to the claimants, for they are the immediate parties to the proceedings. They have reference solely to the claimants of conflicting grants.

In what sense can a settler be deemed a third person? He must be so by virtue of some interest in the premises derived from an independent source. His interest derived from the parties litigant is, by a general rule of law, merged in that of the parties through whom he claims. All actions at law and in equity bind parties thereto. But the term "parties" signifies: 1st. The persons immediately before the Court. 2d. Privies in estate. 3d. Privies in blood. 4th. Privies in law. (1 Green. Ev. Secs. 523, 536.)

The true position of affairs is this: 1. The United States purchased certain vacant land from Mexico. 2. The United States, as a matter of bounty, agreed to sell that land to actual settlers. 3. The land in controversy is admitted by the United States to belong to the Respondents, and that they never owned a foot of it; and third persons are bound by this admission. (*Stringer et al.* v. *Young*, 3 Pet. 341; *Galt et al.* v. *Galloway*, 4 Id. 342, cited with approval in *Bagnell* v. *Broderick*, 13 Id. 446; *West* v. *Cochran*, 17 How. 403; *Stanford* v. *Taylor*, 18 Id. 412; *Willot et al.* v. *Sanford*, 19 Id. 80; Id. 209.)

Again, the defendants cannot claim as pre-emptors, because the land is exempted from the operation of the pre-emption laws. Nor can they claim to be settlers in good faith without notice. (9 U. S. Statutes at Large, 632, Sec. 13; 10 Id. 246, Secs. 6, 3; Act of 1851 relative to settling land claims.)

III. There is no error in the location of the grant. The grant commences its boundary with the north line, not the south. It fixes the *faldas* of the Sierra Nevada range as its starting point. According to the Spanish dictionary, the word means, primarily, *radix montis*. It is sometimes translated *base of a mountain*, sometimes *skirts of a mountain*, and sometimes *trail of a dress*. But it has nowhere an independent existence.

It necessarily adheres to something greater—is a component part of a larger thing. In this case it is attached to the terms Sierra Nevada range of mountains. It cannot, therefore, mean the foot-hills of that range. It must mean the *radix* of the range itself.

FIELD, J. delivered the opinion of the Court—TERRY, C. J. and BALDWIN, J. concurring.

This is an action of ejectment, to recover the possession of a tract of land situated in Butte County. The plaintiffs deraign their title to the premises from a grant issued to Maximo and Dionisio Fernandez, by Pio Pico, formerly Mexican Governor of California, and a patent issued, upon its confirmation, on behalf of the United States. The grant bears date on the twelfth of June, 1846; the claim under it was presented for confirmation to the Board of United States Land Commissioners in March, 1852, and was confirmed by that Board to the claimants in July, 1855, and subsequently by the United States District Court in March, 1857. The Attorney-General of the United States soon afterward gave notice that no further appeal would be prosecuted on the part of the United States, and by an order of the District Court, the claimants had leave to proceed as upon a final decree. The grant describes the land as lying in the immediate vicinity of the river Sacramento, and as bounded on the north by the base of the Snowy Mountains; on the south by the lands of John A. Sutter, and on the east by Feather River. No boundary on the west is specified, but to the *espediente* a map of the tract was annexed, and to this map reference is made in the grant, the third condition of which is in the following language : "The land of which donation is made is merely four square leagues (or four ranges of neat cattle), in conformity with the map annexed to the proceedings (*espediente*). The Judge who may give possession will cause the same to be measured according to the Ordinance, leaving the remainder which may result to the nation for its proper uses." In April, 1857, four leagues— the specific quantity granted—were laid off and surveyed under the directions of the Surveyor-General of the United States for California, and the survey was, in May following, approved by that officer. Upon this survey, and in pursuance of the confirm-

ation, a patent on behalf of the United States was issued to the claimants, bearing date on the 14th of October, 1857, for four leagues of land with the specific description of the official survey. This patent includes the premises in controversy, and the defendants were in their occupation at the commencement of the action.

To resist a recovery, the defendants offered parol evidence, to show that the four leagues, as surveyed and patented, were different from the tract designated in the grant, and the map to which the grant makes reference; that a correct location of the tract, as granted, would not include the premises in suit; that the defendants are citizens of the United States, and had each entered upon a separate quarter section of the premises, claiming the privileges of pre-emptioners under the laws of the United States, and made the improvements required in such cases, and had, in May, 1856, filed their separate declaratory statements in the office of the United States Register, at Marysville, insisting that as such pre-emption claimants, they had acquired vested rights, and that the confirmation of the grant, and the patent issued thereunder, were not conclusive against them under the provisions of the 15th Section of the Act of Congress of March 3d, 1851. The Court below excluded the evidence offered, and its ruling in this respect constitutes the principal error assigned for a reversal of the judgment.

This ruling of the Court, we think clearly correct, and the position of the defendants untenable. It will be seen from the grant that there were no certainty and precision in the boundaries. No official survey of the northern line of the lands of Sutter was ever made under the former government, and none has as yet been made under the government of the United States. The position of that line was a matter still to be determined when the grant to Fernandez was issued. The point where the Sierra Nevada may properly be said to commence, was at the time, and is to this day, a matter of uncertainty. The term *faldas* is used in the original grant, and is sometimes translated "slope of the mountains," and sometimes "base" of them. It represents no independent existence, but only something pertaining to that which is greater. As applied to the Sierra Nevada, it must mean either their "base" or "slope," and not those ele-

vations which precede the general rise of the mountains, and are termed "foot hills." The commencement of such base or slope is not fixed by any marks which give to it precision and certainty. The western boundary is not given at all. It is very evident that the Governor only intended to indicate by the boundaries designated the general outlines of the tract within which the four leagues were to be taken. Between the *faldas* of the Sierra Nevada—not meaning thereby the foot hills, but the base or slope of the mountains—and the line of Sutter, as given by the witness, Bidwell, who made the map referred to in the grant to Fernandez, there is an extent greatly exceeding four leagues. The western boundary is not, as we have stated, given, and between Feather River on the east, and the Sacramento River, in the vicinity of which the land is stated in the grant to lie, there is a much greater width than one league.

If, then, the grant in question is to be regarded as conveying an interest to four leagues lying within a larger tract, the right to measure off and give precision to the specific quantity granted, remained with the former government, and passed with all other public rights to the government of the United States, upon the cession of the country. That right belongs to the political department of the government, and cannot be exercised by Courts of Justice. The Courts can ascertain and fix the position of boundaries which are designated, but cannot give boundaries to a specific quantity which has none, and lies in a larger tract. To give precision and location to such specific quantity a survey must be made by the proper department of government, in which the subject is vested by the legislation of Congress. (See *Waterman v. Smith*, 13 Cal. 373.) With the action of that department, the judiciary cannot interfere. The judiciary must determine, it is true, whether prior rights of third parties have been interfered with by the survey and patent issued thereon, but it cannot correct the one nor the other, and locate the land, where, in its judgment, the location ought originally to have been made. The survey and patent are conclusive upon it in actions of ejectment, except when in conflict with the prior rights of third persons, and then their inconclusiveness can be asserted only to the extent essential for the protection of such prior rights.

We do not understand the counsel of the defendants as ques-

tioning the correctness of these views, but as insisting that the map annexed to the grant embraced the precise quantity of four leagues granted, and as that quantity was to be taken in conformity with such map, the title of the grantees was perfect, requiring no further action of the government, and must be restricted to the land contained in the map; that the subsequent confirmation, survey, and patent, of the United States did not add to the grantees' title, nor could they, without the grantees' assent, in any way have impaired it.

The title of the grantees to the land contained within the map may be admitted to have been perfect, and yet no conclusion follows against the claim of the plaintiffs. If they have accepted the land described in their patent as satisfying their claim, no other persons can object that a portion of the land thus taken is without the boundaries of the grant, unless their prior rights are interfered with. This is a matter between the government and the grantees, with which strangers have no concern. The answer, however, to the position of counsel is this: The government has provided a Board for the determination of the validity of claims to lands held under Mexican grants, and a system for the survey and location of the lands upon the recognition and confirmation of such claims. The survey and location are to follow the decree of confirmation. The approval of the survey by the proper officers is the determination—the judgment of the appropriate department of government, that the survey does conform to such decree. That determination or judgment is not the subject of review by the judiciary. It is conclusive upon the Courts in actions of ejectment, as the adjudication of a competent tribunal, upon a subject within its exclusive jurisdiction. The patent, which is the final document issued by the government, is conclusive evidence of the validity of the original grant, and of its recognition and confirmation, and of the survey, and its conformity with the confirmation, and of the relinquishment to the patentee of all the interest of the United States in the land. It cannot be attacked collaterally, even for fraud, whether charged to have existed in the procurement of the original grant, or in the proof of its execution, or in the making of the survey. For these matters the right of interference rests only with the government. Individuals can resist the

conclusiveness of the patent only by showing that it conflicts with prior rights vested in them. And this brings us to the inquiry whether the defendants possess any such prior rights. The 15th Section of the Act of Congress of 1851, provides that the final decree of confirmation and patent, shall be conclusive between the United States and the claimants only, and shall not affect the interests of third persons. If conclusive between the United States and the claimants, it must be equally so between persons holding under either of those parties; and in *Waterman* v. *Smith, supra,* we held that the third persons mentioned in the Act were those whose title was at the time such as to enable them to resist successfully any action of the government respecting it. The patent took effect by relation, at the date of the presentation of the petition of the patentees to the Board of Land Commissioners, in March, 1852. At that time the pre-emption laws of the United States, under which the defendants assert their acquisition of rights, were not extended to Califoria. Any rights which they possess were subsequently acquired, and must be subordinate to the result of the proceedings then pending by the grantees before the tribunals and officers of the United States. These proceedings had for their object the recognition of the grantees' claim, and the determination of its location with such precision as to leave no room for subsequent dispute and litigation. If settlers, after steps taken for confirmation, could by location acquire such rights to the premises as to authorize them to compel a patentee, in every suit for the recovery of his land, to establish the correctness of the action of the officers of government in their survey and location, the patent, instead of being an instrument of quiet and security to the possessor, would become a source of perpetual and ruinous litigation, and the settlement of land titles in the country be delayed a quarter of a century. The patentee would find it established in different suits, to the utter destruction of his rights, that his land should have been located in as many different places within the exterior boundaries of the general tract, designated in his grant, as the varying prejudices, interests, or notions of justice, of witnesses and jurymen might suggest.

The notice published by two of the plaintiffs and the vendor of the third, in 1856, stating that they had become the owners

of the grant, and specifying its boundaries, and warning tres-passers not to come upon their land within such boundaries, was properly excluded. Such notice could not operate as an estoppel upon the plaintiffs, for two reasons. First, it was only evidence of the *opinion* the parties entertained of the boundaries of their claim; that opinion could not control the action of the officers of government, or affect the validity and effect of the patent. The pre-emptioners are presumed to have known, as such was the law, that the right of survey and location rested exclusively with the government, and was not subject to any direction of the grantees. Nor is it reasonable to hold that the plaintiffs in-tended to abandon all rights to any other land, provided the official survey did not conform to the boundaries they indicated. The most that can be asserted for the notice is, that until the lo-cation of their tract, the parties limited their claim to the land within certain boundaries. It may be possible that such notice would operate as a protection against any demand for damages until the approved survey was made. We do not affirm even this, but certainly it can have no greater effect. In the second place, the settlement was made by the defendants in 1853, and could not have been induced, of course, by the notice published in 1856.

Judgment affirmed.

See *Waterman et al.* v. *Smith,* (*ante*); *Yount* v. *Howell,* (14 Cal.)