[No. 11456.   In Bank. — March 28, 1888.]

THE PEOPLE, APPELLANT, *v.* CITY AND COUNTY OF SAN FRANCISCO, RESPONDENT.

MEXICAN GRANT — PUEBLO LANDS — SAN FRANCISCO — TIDE-LANDS — CONCLUSIVENESS OF PATENT AND SURVEY. — The patent from the United States government to the city and county of San Francisco for the pueblo lands confirmed to it under the acts of Congress of March 3, 1851, and of July 1, 1864, by the decree of the United States circuit court, which patent conforms in its description of the lands granted to the final survey made, as provided in the latter act, in accordance with the instructions of the commissioner of the general land-office, is conclusive evidence, as against the state of California, of the right of the city and county of

San Francisco to all the lands embraced within the exterior limits of the survey, including tide-lands lying below the line of ordinary high tide.

ID. — ACT OF MARCH 3, 1851 — STATE NOT THIRD PERSON. — The state of California is not a "third person," within the meaning of section 15 of the act of March 3, 1851, providing that any patent issued under the act shall be conclusive between the United States and claimants only, and "shall not affect the interests of third persons."

APPEAL from a judgment of the Superior Court of the city and county of San Francisco.

The facts are stated in the opinion of the court.

*Attorney-General Marshall*, and *Philip G. Galpin*, for Appellant.

The land, being below high-water mark, belonged to the state from the date of its admission. (Civ. Code, sec. 670; *Pollard's Lessee* v. *Hagan*, 3 How. 225; *Upham* v. *Hosking*, 62 Cal. 251; *Farish* v. *Coon*, 40 Cal. 47; *Rondell* v. *Fay*, 32 Cal. 364; *People* v. *Morrill*, 26 Cal. 353; *Lux* v. *Haggin*, 69 Cal. 255; *United States* v. *Pacheco*, 2 Wall. 471; *Barney* v. *Keokuk*, 94 U. S. 324.) The patent of the United States in 1884 does not divest the seisin of the state acquired in 1850. (*Teschemacher* v. *Thompson*, 18 Cal. 11; 79 Am. Dec. 151; *Ward* v. *Mulford*, 32 Cal. 365; *Goodtitle* v. *Kibbe*, 9 How. 471–473.) The patent, so far as it purports to grant land outside of that confirmed to the city by the decree of the United States circuit court, is void. (*Moore* v. *Massini*, 37 Cal. 435; *United States* v. *Halleck*, 1 Wall. 455; *United States* v. *Billings*, 2 Wall. 448; *Fossat's Case*, 2 Wall. 649; *United States* v. *Pacheco*, 2 Wall. 590.) Under the Mexican law, no pueblo could own land below high water. (Dwinelle's Colonial History of San Francisco, addend. 42; Wheeler's Land Titles of San Francisco, 13; Civ. Code of Mexico, art. 802; Domat, book 7, tit. 8, sec. 1, art. 1; Hall's Mexican Law, sec. 1466; *New Orleans* v. *United States*, 10 Pet. 662; *Mayor* v. *Maynow*, 1 Mart. 207; *Milne* v. *Girodeau*, 12 La. 324.)

*Garber, Thornton & Bishop, John Lord Love,* and *Edward R. Taylor, amicus curiæ,* for Respondent.

The claim of the state to the land in question was acquired, subject to the power and duty of the general government to locate the grant to the pueblo of San Francisco, and fix its boundaries. (*Teschemacher* v. *Thompson,* 18 Cal. 22; 79 Am. Dec. 151; *Leese* v. *Clark,* 20 Cal. 387; *Ward* v. *Mulford,* 32 Cal. 365; *Thompson* v. *Doaksum,* 68 Cal. 594.) The patent is conclusive against the state as to the location·and boundaries of the pueblo grant, and consequently as to the title to the premises in controversy. (*Manning* v. *San Jacinto Tin Co.,* 7 Saw. 418; *Ely* v. *Frisbie,* 17 Cal. 255; *Moore* v. *Wilkinson,* 13 Cal. 484; *Yount* v. *Howell,* 14 Cal. 465; *Ballance* v. *Forsyth,* 24 How. 185; *Maguire* v. *Tyler,* 8 Wall. 661; *Snyder* v. *Sickles,* 98 U. S. 212; *Waterman* v. *Smith,* 13 Cal. 413; *Boggs* v. *Merced Mining Co.,* 14 Cal. 279; *Teschemacher* v. *Thompson,* 18 Cal. 11; 79 Am. Dec. 151; *Ward* v. *Mulford,* 32 Cal. 365; *Beard* v. *Federy,* 3 Wall. 491; *Wright* v. *Seymour,* 69 Cal. 122.) The state is not a third person within the meaning of section 15 of the act of Congress of March 3, 1851. (*Teschemacher* v. *Thompson,* 18 Cal. 27; 79 Am. Dec. 151; *Waterman* v. *Smith,* 13 Cal. 420; *Leese* v. *Clark,* 18 Cal. 572; *Miller* v. *Dale,* 44 Cal. 562; *Beard* v. *Federy,* 3 Wall. 493; *Carpentier* v. *Montgomery,* 13 Cal. 495; *Manning* v. *San Jacinto Tin Co.,* 7 Saw. 424.)

McKINSTRY, J.—The appeal is from a judgment in favor of the defendant, based upon an order sustaining a demurrer to the complaint.

The prayer of the plaintiff is, that the title of the plaintiff to the premises in question be forever quieted against adverse claims of the defendant, etc., and for other and further relief.

The complaint avers that the land in controversy is "swamp and overflowed," and also that it is "tide-land," lying below the line of ordinary high tides.

It cannot be both "swamp and overflowed" land, included in those ceded by the United States to the state by the act of Congress extending the "Arkansas act," and tide-land, so called. But as the title relied upon by plaintiffs in argument is the title in the state by virtue of her sovereignty to all lands within her borders lying below the line of ordinary high tides, we shall disregard the averment with respect to the land being swamp and overflowed. This we are justified in doing, because every consideration in favor of the right of the state to the land as swamp and overflowed applies with redoubled force in favor of the state's claim to the land as tide-lands.

It is alleged in the complaint that the defendant, as the successor in interest of the pueblo of San Francisco, "a Mexican citizen, claiming to have existed before said conquest" (July 7, 1846), filed its petition before the board of land commissioners, appointed under the act of March 3, 1851, "to ascertain and settle private land claims in the state of California," to procure a determination by them "of its rights to four leagues of land situated upon the peninsula where now stands the city of San Francisco"; that said tribunal, after due proof taken, duly made its decree in regard to the matters set forth in said petition; that said cause was subsequently appealed to the district court of the United States for the northern district of California; that said cause was again transferred under a special act of Congress, passed on the first day of July, A. D. 1864, and entitled "An act to expedite the settlement of titles to lands in the state of California," to the circuit court of the United States for the circuit of California; that said cause in said court was entitled "The City of San Francisco *v.* The United States"; that such proceedings were thereafter had and taken in said cause that a decree final was ultimately rendered by said court, whereby, as between the government of the United States and the city of San Francisco, it was adjudicated and determined.

"DECREE.

"That the claims of the petitioners, the city of San Francisco, to the land hereinafter described is valid, and that the same be confirmed. The land of which confirmation is made is a tract situated within the county of San Francisco, and embracing so much of the extreme upper portion of the peninsula above *ordinary high-water mark* (as the same existed at the date of the conquest of the country, namely, the 7th of July, 1846), on which the city of San Francisco is situated, as will contain an area of four square leagues; said tract being bounded on the north and east by the bay of San Francisco, on the west by the Pacific Ocean, and on the south by a due east and west line drawn so as to include the area aforesaid, subject to the following deductions, namely: such parcels of land as have been heretofore reserved or dedicated to public uses by the United States; and also such parcels of land as have been, by grants from lawful authority, vested in private proprietorship, and have been finally confirmed to parties claiming under said grants by the tribunals of the United States, or shall hereafter be finally confirmed to parties claiming thereunder by said tribunals, in proceedings now pending therein for that purpose, all of which said excepted parcels of land are included within the area of four square leagues above mentioned, but are excluded from the confirmation to the city. This confirmation is in trust for the benefit of the lot-holders, under grants from the pueblo, town, or city of San Francisco, or other competent authority, and as to any residue in trust for the use and benefit of the inhabitants of the city."

And the complaint further alleges that the premises therein described, the title whereto the plaintiff asks to have quieted, "are without the boundaries of said pueblo as given in said decree; the same were at the date of said conquest below high-water mark."

The complaint further alleges that, "for the purpose of carrying said decree into execution," a survey was made

and approved by the surveyor-general of the United States for the district of California in the year 1867–68, of which notice was given as provided in the act of Congress of July 1, 1864, and the same was duly advertised; that objections were made to the survey, and the commissioner of the general land-office approved the survey, but allowed an appeal to the Secretary of the Interior; that the secretary disapproved the survey, and ordered a new survey to be made; that a new survey and plat was made by the surveyor-general for California and transmitted to the commissioner of the general land-office, the same being certified by said surveyor-general as having been made in strict accordance with the instructions of the commissioner, the said instructions having been given under direction of the Secretary of the Interior.

And the complaint further avers: "Thereafter a patent in due form of law, based upon the said last-mentioned plat and survey, was issued under the great seal of the United States, and signed by the President thereof, which purported, by virtue of the authority of said decree, and in pursuance thereof, to grant and convey to the city of San Francisco the tract of land embraced and descr.bed in said last-mentioned plat and survey, and embracing four square leagues, and including said premises within the exterior boundaries thereof."

It is also again directly alleged that the premises here in controversy are included in the plat and survey so as aforesaid made under the direction and supervision of the department of the interior.

That the defendant claims some interest under the patent and otherwise in the premises adverse to plaintiff, and that the patent is a cloud on plaintiff's title; then follows a description by metes and bounds of the tract of land (containing 150 acres, more or less) of which the plaintiffs claim to be the owners.

It is contended on the part of appellants, that as the

surveyor-general had no power to include in a survey any land the claim to which was not confirmed by the decree of the circuit court, so neither the commissioner of the land-office nor the Secretary of the Interior had any power to direct or approve such a survey; that the powers of these officers are defined and limited by law, and as the law gave them no power to include in the survey or patent land the claim to which was not confirmed to San Francisco, the patent must read as relinquishing only the right of the United States in the land included in the description in the decree; furthermore, that the United States had no interest to relinquish in lands below ordinary high-water mark, inasmuch as the title to such lands attached to the state of California.

There was never any demarkation of the boundaries of the pueblo lands by the authorities of Mexico. The right or title of the defendant in the pueblo lands was, therefore, incomplete when California was ceded to the United States. But it is unimportant whether the right to the pueblo lands, such as it was, was complete or incomplete, perfect or imperfect.

If a claimant under a Mexican grant, which gives a perfect title, has presented his claim to the land commissioners, appointed under the act of Congress of 1851, and it has been confirmed and surveyed and patent issued, but by the survey a portion of the land included in the juridical measurement of the Mexican authorities was excluded, the claimant is estopped from asserting title to land not included in the survey made by the United States (*Cassidy* v. *Carr*, 48 Cal. 339); not only the claimant but all other persons except such as may have derived a title from the Mexican government before the grant or cession upon which the claimant secured a confirmation. In *Moore* v. *Wilkinson*, 13 Cal. 487, it was said: "The title to the grantees to the land contained within the map (*deseno*) may be admitted to have been perfect, and yet no conclusion follows against the claim

of the plaintiffs. If they have accepted the land described in their patent as satisfying their claim, no other persons can object that a portion of the land thus taken is without the boundaries of the grant unless their prior rights are interfered with."

Whatever may be the rights of the respective parties to this action, their rights are not affected by the circumstance that the right of the pueblo to lands was or was not perfect or complete. In *Moore* v. *Wilkinson* a portion of the lands surveyed and patented by the United States was without the limits of the tract to which it was claimed the predecessors of the plaintiff had received a perfect title from Mexico.

We are to inquire what were the powers of the surveyor-general and land department under the acts of Congress relating to claims to land derived from Mexico, or existing under the laws of that state.

We need not consider the act of June 14, 1860, as none of the proceedings for the confirmation of the pueblo title were taken, so far as appears, under that act. The fourth section of the act of July 1, 1864, provides that in certain circumstances the district court may order a case appealed from the commissioners to be transferred to the circuit court. The pueblo claim was so transferred. But with reference to such cases, the powers of the circuit court and of the surveyor-general and officers of the land department were the same as were, in other cases, the powers and duties of the district court and surveyor and other officers of the land department.

By the treaty of Guadalupe Hidalgo, the United States had stipulated that property rights acquired under the former sovereign should be respected.

The act of Congress of March 3, 1851, " to ascertain and settle the private land claims in the state of California," made provision for the appointment of commis-

sioners, to whom should be presented all claims to land derived from the Spanish or Mexican government.

It further provided that when a case should be ready for hearing, etc., the commissioners should proceed promptly to examine the same, "and to decide upon the validity of said claim."

The act allowed an appeal to the district court, and thence to the supreme court of the United States; each court in turn to decide upon the validity of the claim.

Section 13 of the act provided: "For all claims finally confirmed by said commissioners, or by said district or supreme court, a patent shall issue to the claimant, upon his presenting to the general land-office an authentic certificate of such confirmation, and a plat or survey of said lands, duly certified and approved by the surveyor-general of California, whose duty it shall be to cause all private land claims which will be finally confirmed to be accurately surveyed, and furnish plats of the same, etc."

The first section of the act of 1864 provides that, "whenever the surveyor-general shall in compliance with the thirteenth section of ' An act to ascertain and settle the private land claims in the state of California,' approved March 3, 1851, have caused any private land claim to be surveyed and a plat to be made thereof," he shall give notice of the same by a certain publication, and if no objections are made to such survey within the time named in the publication, he shall approve the same and transmit a copy of the survey to the commissioner of the general land-office at Washington for his examination and approval; but if objections are made, he shall transmit such objections, together with affidavits or proofs, that if the commissioner disapprove of the survey, then when a new survey is made in accordance with the directions of the commissioner, and the commissioner shall approve of the same, he shall cause a patent to issue, etc.

By the acts of 1851 and 1864, the commissioners or the district or circuit or supreme court, as the case may be, has power to determine whether a claim is valid, and such as should be confirmed. The power of locating the confirmed claim is conferred upon the surveyor-general, his survey being subject to revision by the executive officers authorized to supervise and direct the surveyor's action. There is no provision for a return of the survey or plat to the commissioners, or into court; but when a survey becomes final, and a patent issued, the limits of the claim as confirmed are definitely and conclusively determined by reference to the patent, and the survey therein recited.

"The government had provided a board for the determination of the validity of claims to land held under Mexican grants, and a system for the survey and location of the lands upon the recognition and confirmation of such claim. The survey and location are to follow the decree of confirmation. The approval of the survey by the proper officers is the determination, — the judgment of the appropriate department of the government that the survey does conform to such decree. That determination or judgment is not then a subject of review by the judiciary. . . . . The patent, which is the final document issued by the government, is conclusive evidence of the validity of the original grant, and of its recognition and confirmation, and of the survey *and its conformity with the confirmation*, and of the relinquishment to the patentee of all interests of the United States in the land." (Field, C. J., in *Moore* v. *Wilkinson, supra.*)

And in *Chipley* v. *Farris*, 45 Cal. 539, our predecessors, speaking by Mr. Justice Rhodes, said: "It is contended by the plaintiffs that the survey, which is incorporated into the patent, does not accord with the decree of confirmation, and that they are entitled to rely upon the decree,—which is also incorporated into the patent, — for title to lands within the decree, but not within the

survey. . . . . The patent purports to convey the lands described within the survey, and its scope cannot be extended, nor, on the other hand, can it be limited by showing that the decree comprised a greater or less area than the survey."

But section 15 of the act of 1851 declares that the decree of the commissioners, or of the district or supreme court, or any patent to be issued under the act, shall be conclusive between the United States and claimants only, "and shall not affect the interests of third persons"; and it is insisted that plaintiffs are third persons within the meaning of the clause quoted.

If the Mexican government had power to grant lands below the line of the ordinary tides, the state of California, upon its admission into the Union, became the owner of such tide-lands only as had not been previously disposed of by Mexico. No authority has been cited in support of the statement that, by the law of Mexico, tide-lands could not be included within pueblo lands. And, as the proper department of our government has determined that a survey, which included such lands, conformed to the decree of confirmation, that question cannot be reconsidered here. The land department has power to locate all claims confirmed. It follows that the state never had any title to the land here in controversy.

Conceding that the United States, from the date of the treaty to the admission of California into the Union, held the legal title to all the tide-lands, not previously granted by Mexico, in trust for the state to be created, the title of the United States was not acquired previous to the acquisition of the territory, and when it passed to the state it was taken in subordination to the future action of the United States in determining the location of the older claim and title of the pueblo.

The supreme court of this state has said: "Unless a patent is issued without authority, or is prohibited by

statute, or is void upon its face, its operation against the government and those claiming by title subsequent cannot be questioned in any collateral suit." As against a patent issued under the law of 1851, who are parties claiming by title subsequent? In *Leese* v. *Clark*, 18 Cal. 574, the court, by Field, C. J., said: "The defendants, taking whatever interest they possess in subordination to the future action of the government, . . . . in determining the location of the older grant, are in no position to question these proceedings." That is, proceedings for the location of the older grant. And the same learned judge said: "The term 'third persons' refers, not to all persons other than the United States and the claimants, but to those holding independent titles arising previous to the acquisition of the country." (*Leese* v. *Clark*, 20 Cal. 425.)

*Teschemacher* v. *Thompson*, 18 Cal. 11, 79 Am. Dec. 151, was an action of ejectment wherein the plaintiff relied on a patent issued upon a confirmed Mexican grant. The premises demanded were, as claimed by the defendant and assumed by the court, below the ordinary high-water mark, covered by the ordinary or neap tides, and the defendant's contention was, that they were the property of the state.

The court held that the land, at the date of the admission of California as a state, belonged to the state, unless it had been the subject of a previous grant by the Mexican government, which the United States, upon the acquisition of the country, were bound to protect, and which they have since recognized and confirmed. And Chief Justice Field, on behalf of the court, said: "Until the acquisition of the country, the land was of course under the jurisdiction, control, and disposition of the former government, and the rights acquired by the United States were in subordination to the action of that government, so far as such action was entitled to consideration, either from the law of nations or the stipula-

tions of the treaty of cession.   In that respect, the land under the tide-waters of the bay, between low and high water mark, stood in no different position from that of any other land over which the former government possessed the power of disposition."

The court, after referring to the obligation imposed upon the government of the United States by the law of nations, and by specific provision of the treaty of Guadalupe Hidalgo, proceeds to say that the power of the government of the United States to protect by appropriate legislation, as by the act of 1851, all titles, legal or equitable, acquired previous to the cession of the territory, cannot be questioned.   "The power results from the fact that it is sovereign and supreme as to all matters connected with the treaty and the enforcement of the obligations incurred thereunder. . . . . It must determine for itself what claims to property existed at that date, which it is bound to protect, *and consequently the lands to which they apply,* and the parties by whom they were then held.   In protecting those claims, it must necessarily make them good as against others asserting interests from events subsequently transpiring, otherwise its power to carry out the stipulations of the treaty and the obligations imposed by the law of nations would be limited and dependent, and not sovereign and supreme. Subsequent claimants must, therefore, take in strict subordination to its action. . . . . Nor can subsequent claimants have any just grounds of complaint, for whatever interests they may possess were acquired with full knowledge of the treaty and of the obligations and powers of the new government.

"By the act of March 3, 1851, the government has established a tribunal for the investigation of the validity of the titles asserted to have existed previous to the cession; required evidence to be presented respecting the same; designated law officers to appear and litigate the matter on behalf of the United States; authorized

appeals, first to the district and then to the supreme court; and appointed surveyors to survey and measure off the land when once the title has been recognized and confirmed. . . . . As the last act in the series of proceedings, a patent is to issue to the claimant." The court then holds that the patent, "as the record of the government of the existence and validity of the grant," establishes the title of the patentees from the date of the Mexican grant.

If the boundaries of a grant had .not been definitely fixed by the authorities of Mexico at the date of the cession of the territory within which California is comprised, the duty devolved upon the government of the United States to make the location. This by reason of the duty to protect the grant. "The duty of the government attaching at the date of the cession, its performance could not be interfered with or defeated by any matters subsequently occurring. The patent, therefore, to the plaintiff . . . . is evidence that the grantees possessed at the date of the cession a vested interest in the quantity of land mentioned in the grant,— a right to so much land to be afterwards laid off by official authority; . . . . and that the government of the United States, in discharge of its duty, has, through its appropriate departments, made the appropriation, and thereby given precision to the title of the grantees, and attached it to the tract as surveyed. The 'third persons' against whose interest the action of the government and patent are not conclusive,—under the fifteenth section of the act of March 3, 1851,—are those whose title accrued before the duty of the government and its rights under the treaty attached."

In *Ward* v. *Mulford*, 32 Cal. 365, the plaintiff claimed under a decree confirming a Mexican grant, and a survey made under the act of Congress of 1860, approved by a decree of the district court of the United States, which included tide-lands. But in the opinion of the

court (by Mr. Justice Sanderson), *Teschemacher* v. *Thompson* is approved, and it was said that when the state of California came into the Union, with her claim to such lands as she then acquired by virtue of her sovereignty, she acquired such claim in subordination to the prior equities of grantees under the former sovereign, and was bound by such action as the federal government might take in ascertaining and settling such equities. " In this respect no distinction can be made between the lands acquired by federal grants, and such as she took by virtue of her sovereignty. In respect to the latter as well as the former, the United States succeeded to the title, and took it upon precisely the same terms upon which the Mexican government held it at the date of the cession. And so of the state."

Nothing is decided in *More* v. *Massini*, 37 Cal. 432, which is in conflict with the views above expressed. There it was held that by the true construction of the survey set forth in the patent, the sea-shore was the southern boundary of the land granted. The court said: "The survey mentions the sea-shore as the termination of the fourth course, and the twelfth course commences at the sea-shore, but at the intermediate stations no visible object, nor any monument, either natural or artificial, is mentioned. The call for the sea-shore as the southern boundary must be regarded as the more definite and certain, 'and will prevail over a call for a mere station,' and over the courses and distances."

In that case the question was, whether the demanded premises were within the survey recited in the patent, and the court held they were not. In the case at bar, the complaint avers that the lands described therein are within the plat and survey finally approved, and which include the lands patented. Here the lands in dispute are embraced by the patent, and by the lines of the survey. Therefore, as said in *More* v. *Massini*, 37 Cal. 435, *Teschemacher* v. *Thompson* and *Ward* v. *Mulford, supra,* are decisive of this case.

Our conclusions are: 1. The land, the title of the United States wherein is granted by the patent to the city and county of San Francisco, is the land embraced in the approved survey set forth in the patent; 2. The patent is conclusive evidence of the right of defendant to all the lands embraced within the survey, except that it does not affect the interests of the "third persons" mentioned in section 15 of the act of 1851; 3. The plaintiffs are not a "third person" within the meaning of section 15 of the act.

Judgment affirmed.

Searls, C. J., Sharpstein, J., McFarland, J., and Thornton, J., concurred.

Paterson, J., dissenting.—I dissent.  Conceding that the state is not a "third person" within the meaning of that phrase as employed in section 15 of the act of 1851, there is but one question left for determination in this case.  It is a question simply of construction.  It is not a question of collateral attack.  The decree and patent must be read together.  In fact, we know that it is the practice of the land department to make the decree a part of the patent.

The case in effect is one simply where the plaintiff claims that the defendant's title depends upon a deed describing the property by natural boundaries, and also by metes and bounds; that the description by metes and bounds includes lands not included within the natural boundaries; that defendant claims an interest in the lands lying between the natural and the artificial lines; that plaintiff is the owner of all the lands between the two lines, and his title thereto should be quieted, because the natural and permanent boundary lines given in the deed should prevail over the description by metes and bounds.  The city could in no way be prejudiced by a determination of this question.  No survey would be required to fix new lines.  The work

that has been done would not be undone. The location of the south line would not be disturbed. To determine the issue here, it would be necessary only to draw upon the earth a line corresponding with the metes and bounds given in the patent; and unless the plaintiff could show that some portion of the land in controversy lies between that line and existing, well-defined, natural, and permanent boundary lines indicating the line of high-water mark referred to in the decree, they would, of course, fail to make out their case.

It cannot be presumed in aid of a demurrer that the shore of the sea which bounds the land in question on three sides has been obliterated. The complaint alleges as a fact, which must be taken as true, that *the lands in controversy lie below ordinary high-water mark*. If a patent should describe a tract of land as bounded on three sides by well-known, natural, and perpendicular walls, like those of Yosemite, or should describe it as lying in a triangle at the junction of navigable streams, like that adjacent to the confluence of the Sacramento and San Joaquin rivers, and should also give a description by metes and bounds, the former, for the purposes at least of stating a cause of action, — a *prima facie* case, — would be preferred to the latter. The lands are described in the decree as being bounded on three sides by the bay of San Francisco and the Pacific Ocean. The court cannot say as a matter of law that no portion of the land in controversy, *although admitted to be below high-water mark*, lies in a portion of the peninsula where the ocean or the bay is not a natural, fixed, and certain boundary line, and that, therefore, the metes and bounds given in the survey are in no way controlled by the natural boundaries. The admission kills the conclusion.

The questions here are not whether the state courts can review the action of the officers of the land department, or whether the land department of the United States could divest the state of her title to the land in

controversy, or whether the patent protects the grant of the confirmee from collateral attack.    The questions are: What is the *effect* of the action of the land department? *Has* the state been divested of her title through this patent, in view of its descriptions and recitals?    Which description shall prevail, that by metes and bounds, or that by natural monuments?    In determining these questions, there is no violation of the principles which forbid a collateral attack upon such instruments.    There is no such attack.    Surely, if the surveyor had run his lines through the bay of San Francisco and included lands of the state in the county of Alameda, which she became owner of by virtue of her relations to the paramount source of title, the state, as such owner of land across the bay, would not be bound by the survey so long as that natural monument and limit of boundary —the bay of San Francisco—remained where it is, a notice to all the world; and the decree of confirmation, which is a link in the chain of title, remained as a public muniment of title.

No case has been cited inconsistent with the rule that in cases of this kind the natural and permanent boundaries will prevail.    In many of the cases cited, there was no variance between the decree of confirmation and the patent.    In *Teschemacher* v. *Thompson* the grant was assumed to be one of *quantity* only.    The grant was confirmed by the court, and its boundaries, as defined in the decree, were followed in the patent, which was issued in November, 1857, at which time the federal courts controlled the surveys, and were empowered and expected to make them conform to the decree.

In none of the cases cited is the question of the power of the officer to issue a patent for land not embraced in the decree considered.    *More* v. *Massini*, 37 Cal. 432, is directly in point.    In that case the patent did not show upon its face that any land below high-water mark was included in the tract granted, but the fact was shown at

the trial by witnesses,—surveyors; and it was there held that the clause of the decree of confirmation which confirmed the tract bounded by the sea-shore should prevail over a description by metes and bounds.    In the case of *Chipley* v. *Farris,* 45 Cal. 528, upon which respondents place their chief reliance, there were two inconsistent descriptions, *but both were descriptions given by a surveyor,* and it is expressly admitted by respondent in that case, in his written points, that if the side lines of the tract in controversy were the sea-shore, a different rule would apply, and that *More* v. *Massini,* 37 Cal. 432, would be in point, the line of high-water mark in such cases being considered by the government the more certain boundary line.    Of course, where both descriptions are lines established by surveyors for the decree and for the patent, the last, that one contained in the survey and incorporated into the patent, will control.    Where watercourses, mountains, or other natural objects are called for in patents, it has been said that distances must be lengthened or shortened, and courses varied, so as to conform to these objects, because mistakes in distances and courses are more probable and more frequent than mistakes as to trees, rivers, mountains, and other objects capable of being clearly and accurately fixed.    (*McIver* v. *Walker,* 9 Cranch, 177.)

In the case at bar, three sides of the triangular tract described are bounded by the shores of the ocean and bay.    Unless we must shut our eyes to what every resident of the peninsula can see, we know judicially that a great portion of those lines have remained for ages as they now appear; but if they have changed, it is a matter of defense which should be alleged, and which may be easily proved.